TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, YOO & BRILL LLP
10250 Constellation Blvd., Suite 1700
Los Angeles, CA  90067
Telephone: (310) 229-1234 / Fax: (310) 229-1244
Email: tma@lnbyb.com

Attorneys for Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>GRAND VIEW FINANCIAL, LLC,<br><br>        Debtor and Debtor in Possession. | Case No.: 2:17-bk-20125-RK<br><br>Chapter 11 Case<br><br>**DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER:**<br>**(1) APPROVING THE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS,  ENCUMBRANCES, AND INTERESTS, WITH THE EXCEPTION OF ENUMERATED EXCLUSIONS, SUBJECT TO OVERBID,**<br>**(2) FINDING THAT THE BUYER IS GOOD FAITH PURCHASER,**<br>**(3) APPROVING BIDDING PROCEDURES AND BREAK-UP FEE,**<br>**(4) AUTHORIZING AND APPROVING THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS, AND**<br>**(5) WAIVING THE FOURTEEN-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h);**<br>**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**<br><br>Hearing<br>Date:   August 7, 2018<br>Time:  2:30 p.m.<br>Place:  Courtroom 1675<br>            255 E. Temple Street<br>            Los Angeles, CA  90012 |

**PLEASE TAKE NOTICE** that Grand View Financial, LLC, the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor"), hereby moves, pursuant to this motion (the "Motion"), for the entry of an order (the "Sale Order"):

(1)    pursuant to 11 U.S.C. §§ 363(b) and (f), approving the sale of the Debtor's residential real property located at **38303 Kearsarge Mill Rd., Alta, CA 95701** (the "Kearsarge Property") to (a) Parker James Geisinger and Katelyn Joy Geisinger (together, the "Buyer"), free and clear of any and all liens, claims, encumbrances, and interests, with the exception of Items 1, 5-13, and 15 (the "Excepted Items") set forth in the preliminary title report for the Property (the "Title Report") attached hereto as **Exhibit "1,"** for a purchase price of $375,500 (the "Purchase Price") pursuant to the Counteroffer re Purchase and Sale of 38303 Kearsarge Mill Rd., Alta, CA 95701 (the "Purchase Agreement"), a true and correct copy of which is attached hereto as **Exhibit "2,"** subject to overbid (each an "Overbid" and collectively the "Overbids") pursuant to the overbid procedures (the "Overbid Procedures") set forth below and any auction (the "Auction") conducted pursuant to the Overbid Procedures, or (b) the winning overbidder (each an "Overbidder" and collectively the "Overbidders") at the Auction;

(2)    pursuant to 11 U.S.C. § 363(m) finding that the Buyer or any winning Overbidder at the Auction confirmed as the winning bidder for the Kearsarge Property is a "good faith" purchaser entitled to the protections afforded under 11 U.S.C. § 363(m);

(3)    approving the following Overbid Procedures and break-up fee (the "Break-Up Fee"):

- **Date, Time, and Location of the Auction:** The Auction shall be held concurrently with the hearing on the Motion, as follows:

  Date: **August 7, 2018**
  Time: **2:30 p.m.**
  Place: **Courtroom 1675**
  **255 E. Temple Street**
  **Los Angeles, CA  90012**

- **Initial Overbid Amount:** The Purchase Price of $375,000, plus *at least* $10,000 more (*i.e.*, at least $385,000) (the "Initial Overbid Amount");

- **Qualification of Overbidders:** In order for any prospective Overbidder to have the right to bid at the Auction, the prospective Overbidder must, **within three (3) business days prior to the Auction**, (a) provide to counsel for the Debtor, Levene, Neale, Bender, Yoo & Brill L.L.P., c/o Todd M. Arnold, 10250 Constellation Boulevard, Suite 1700 Los Angeles, California 90067, Telephone: (310) 229-1234 Facsimile: (310) 229-1244, Email: tma@lnbyb.com ("LNBYB"), a signed proposed purchase agreement (each an "Overbid Purchase Agreement"), in substantially and materially the same form as the Purchase Agreement,[1] redlined to show any changes, with such purchase agreement not to contain any financing, inspection, due diligence, or other contingencies (other than the entry of the Sale Order approving the sale of the Kearsarge Property to the Overbidder), and including, a removal of all contingencies (other than the entry of the Sale Order approving the sale of the Kearsarge Property to the Overbidder) pursuant to CAR Form CR 14.C.), and with a minimum purchase price of at least the Initial Overbid Amount of $385,000; (b) submit a deposit in the amount of 10% of the Initial Overbid Amount set forth in the Overbid Purchase Agreement by cashiers' check or wire into a segregated trust account maintained by LNBYB, who will provide wire instructions on request; (c) demonstrate that the prospective Overbidder has sufficient funds or financing to close the transaction within fifteen (15) calendar days of the entry of the Sale Order approving the prospective Overbidder and the sale of the Kearsarge Property to the Overbidder; and (d) agree that the prospective

---

[1] LNBYB will provide a copy of the Purchase Agreement in Word to any parties interested in submitting an Overbid.

Overbidder's deposit will be non-refundable if the prospective Overbidder is the winning bidder at the Auction and fails to close the purchase of the Kearsarge Property within fifteen (15) calendar following the date of entry of the Sale Order – regardless of whether an appeal has been filed of the Sale Order, provided there is no entered stay pending appeal of either of the foregoing orders (*i.e.*, no final order requirement); and

- **Overbidding Increments and Considerations in Determining the Winning Bidder at Any Auction:** In order to qualify to bid at the Auction, any Overbid Purchase Agreement is required to include an Initial Overbid Amount of at least $385,000. Subsequent overbids at the Auction must be in increments of $1,000 or amounts that are wholly divisible by $1,000. The Debtor, in consultation with its professionals, will select the highest and best offer and recommend Court approval of the sale of the Kearsarge Property to the Buyer or any qualified Overbidder that, in the opinion of the Debtor, in consultation with its professionals, has made the highest and best offer for the Kearsarge Property.

- **Break-Up Fee:** In the event the Buyer is not the successful bidder at the Auction and an Overbidder closes a purchase of the Kearsarge Property, the Debtor shall pay a $5,000 Break-Up Fee (1.3% of the Purchase Price) to the Buyer upon the close of escrow.

(4) authorizing the Debtor to pay from the proceeds of the sale of the Kearsarge Property (a) any pre-closing real property taxes secured by the Kearsarge Property allocated to the Debtor, (b) the 6% commission owed to the Debtor's broker, Keller Williams Realty and KW Commercial (the "Primary Broker") and associated Keller Williams Realty and KW Commercial offices located throughout the United States ("Associated Brokers" and, together with Primary Broker, the "Broker"), and any cooperating broker, pursuant to the Purchase Agreement and the Debtor's application to employ the Broker, which

4

was approved by the Court, and (c) any other customary escrow closing fees and charges allocated to the Debtor;

(5)    waiving the 14-day stay period set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure ("FRBP") to enable the sale of the Kearsarge Property to close as quickly as possible; and

(6)    providing such other relief as is appropriate under the circumstances.

**PLEASE TAKE FURTHER NOTICE** that the principal terms and conditions of the proposed sale to the Buyer, subject to overbid, include the following:[2]

- Name of Buyer: Parker James Geisinger and Katelyn Joy Geisinger (*i.e.*, the "Buyer").

- Asset: The Kearsarge Property.

- Purchase Price: $375,000 subject to overbid pursuant to the Overbid Procedures.

- Deposit: $11,250 (3% of the Purchase Price)

- Estimated Costs of Sale: Total of 8% comprised of a 6% commission for the Debtor's broker, plus any outstanding  real property taxes, plus other customary closing costs.

- Condition of Asset/Property: "As-is" and "Where is."

- Contingencies: The Purchase Agreement contained a due diligence period that expired on July 2, 2018.  All contingencies have now been lifted other than the entry of the Sale Order approving the sale of the Kearsarge Property to the Buyer.

- Other Terms: The sale is subject to the Overbid Procedures and Break-Up Fee set forth above.  Further, the Debtor's sale of the Kearsarge Property shall be free and clear of any and all liens, claims, encumbrances, and interests, other than the Excepted Items, which non-excepted liens, claims, encumbrances, and interests the Debtor believes

---

[2] This is a summary only.  To the extent there is any inconsistency between this summary and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern.

are limited to (a) Items 2-4 of the Title Report, which are liens securing for claims for unpaid real property taxes owed to Placer County (the "County"), which will be paid from escrow upon closing, (b) Item 14 of the Title Report, which the Debtor believes is a lien allegedly securing a claim for a prior loan from Capital Valley Bank ("Capital Bank") that was repaid, but which claim and lien will attach to the proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority as such claim and lien had prior to the sale, (c) Item 16 of the Title Report, which the Debtor believes is a purported lien allegedly securing an alleged loan from Suntrust Mortgage ("Suntrust") that was later allegedly transferred to US Bank National Association, as Trustee of the PRP II Pals Investments Trust ("US Bank"), but which claim and lien, will attach to the proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority as such claim and lien had prior to the sale, (d) Item 17 of the Title Report, which the Debtor believes is a lien allegedly securing a potential claim for a line of credit from Beneficial California, Inc. ("Beneficial") that was either not drawn on or repaid, but which claim and lien will attach to the proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority as such claim and lien had prior to the sale, and (e) any unrecorded liens, claims, encumbrances, and interests.

- **Potential Tax Consequences:** The Debtor will have to pay applicable capital gains taxes stemming from the sale of the Kearsarge Property after applicable deductions and exemptions.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based upon 11 U.S.C. §§ 105(a), 363(b), (f), and (m), FRBP 2002 and 6004, any applicable Local Bankruptcy Rules (the "LBR"), the annexed Memorandum of Points and Authorities and Declarations in support of the Motion, as well as the exhibits thereto (together, the "Memorandum, Declarations, and Exhibits"), the concurrently filed notice of the Motion (the "Notice") all other evidence duly admitted by the Court in connection with consideration of the Motion, the record in this case, and the arguments and statements of counsel to be made at the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(f), any opposition to the Motion must (1) be in writing and include all reasons and evidence in support of the opposition, (2) be filed at least fourteen (14) days prior to the hearing on the Motion, and (3) be served on the United States Trustee and counsel for the Debtor.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the Court may deem the failure of any party to file a timely opposition to the Motion to constitute consent to the granting of the Motion and the relief requested herein.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a Sale Order providing the relief requested in paragraphs (1) through (6) of the above Motion.

Dated: July 12, 2018                    GRAND VIEW FINANCIAL, LLC


By:    */s/ Todd M. Arnold*
          TODD M. ARNOLD
          LEVENE, NEALE, BENDER, YOO
            & BRILL L.L.P.
          Attorneys for Debtor and
          Debtor in Possession

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 8

I. STATEMENT OF FACTS .................................................................................................... 8

    A.    GENERAL BACKGROUND ......................................................................... 8

    B.    THE DEBTOR'S BUSINESS AND REAL PROPERTY ................................ 8

    C.    THE DEBTOR'S ACQUISITION OF THE KEARSARGE
            PROPERTY. ............................................................................................... 9

    D.    THE REASONS FOR FILING BANKRUPTCY AND THE
            DEBTOR'S EXIT STRATEGY. ................................................................ 10

    E.    ACTIONS BY THE DEBTOR IN FURTHERANCE OF ITS EXIT
            STRATEGY. ............................................................................................... 12

    F.    PRIOR AND ONGOING MARKETING EFFORTS REGARDING
            THE SALE OF THE KEARSARGE PROPERTY. ................................... 12

    G.    THE PROPOSED SALE OF THE KEARSARGE PROPERTY UNDER
            THE PURCHASE AGREEMENT. ............................................................ 13

    H.    ALLEGED LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS
            RECORDED AGAINST THE KEARSARGE PROPERTY. ..................... 15

    I.    THE PROPOSED OVERBID PROCEDURES AND BREAK-UP FEE. ........... 18

II. LEGAL ARGUMENT ...................................................................................................... 20

    A.    THE COURT SHOULD APPROVE THE SALE OF THE
            KEARSARGE PROPERTY TO THE BUYER, SUBJECT TO
            OVERBID, OR TO ANY WINNING OVERBIDDER AT AUCTION. ............. 20

          1.    THE DEBTOR HAS OR WILL HAVE COMPLIED WITH ALL
                APPLICABLE NOTICE REQUIREMENTS. .......................................... 20

          2.    THE SALE OF THE KEARSARGE PROPERTY TO THE BUYER,
                SUBJECT TO OVERBID, OR TO ANY WINNING OVERBIDDER
                AT AUCTION, SHOULD BE APPROVED, BECAUSE GOOD
                BUSINESS REASONS FOR THE SALE EXIST, THE PURCHASE
                PRICE FOR THE KEARSARGE PROPERTY IS FAIR AND
                REASONABLE, AND THE PROPOSED SALE IS IN THE BEST
                INTERESTS OF THE ESTATE AND CREDITORS. ............................. 21

B.    THE COURT SHOULD APPROVE THE SALE OF THE KEARSARGE PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, OTHER THAN THE EXCEPTED ITEMS, TO THE BUYER OR ANY WINNING OVERBIDDER AT THE AUCTION ...................................................................... 26

C.    THE COURT SHOULD APPROVE THE OVERBID PROCEDURES AND THE BREAK-UP FEE. .............................................................. 28

D.    THE COURT SHOULD APPROVE THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS UPON THE CLOSE OF THE SALE OF THE KEARSARGE PROPERTY. ....................................... 31

E.    THE COURT SHOULD WAIVE THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULES 6004(h). ...................................... 32

III. CONCLUSION ................................................................................................... 33

DECLARATION OF STEVE ROGERS ........................................................................ 34

DECLARATION OF W. DARROW FIEDLER ............................................................... 45

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Federal Cases**

4

*In re 995 Fifth Ave. Assoc., L.P.*

5
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................................. 30

6

*In re Abbotts Dairies*
    788 F.2d at 149 ................................................................................................... 25

7

*In re Alpha Industries, Inc.*

8
    84 B.R. 703 (Bankr. Mont. 1988) ..................................................................... 24

9

*In re Atlanta Packaging Products, Inc.*

10
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ........................................................ 28, 29

11

*Big Shanty Land Corp. v. Comer Properties, Inc.*

12
    61 B.R. 272 (Bankr. N.D. Ga. 1985) ......................................................... 8, 24

13

*In re Canyon Partnership*
    55 B.R. 520 (Bankr. S.D. Cal. 1985) ............................................................... 24

14

*Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot)*

15
    94 B.R. 343 (Bankr. E.D. Pa. 1988) ................................................................ 26

16

*Cottle v. Storer Communication Inc.*
    849 F.2d 570 (11th Cir. 1988) .......................................................................... 30

17

*In re Crowthers McCall Pattern, Inc.*

18
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ...................................................... 29, 30

19

*In re Ex-Cel Concrete Company, Inc.*

20
    178 B.R. 198 (B.A.P. 9th Cir. 1995) ................................................................ 26

21

*In re Financial News Network, Inc.*
    126 B.R. 152 (Bankr. S.D.N.Y. 1991) ............................................................ 30

22

*In re Gabel*

23
    61 B.R. 661 (Bankr. W.D. La. 1985) ............................................................... 27

24

*In re Gerwer*

25
    898 F.2d 730 (9th Cir. 1990) ............................................................................ 26

26

*In re Integrated Resources, Inc.*
    147 B.R. 650 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds*, 3

27
    F.3d 49 (2d Cir. 1993) ................................................................................ 30, 31

28

*In re Karpe*
    84 B.R. 926 (Bankr. M.D.Pa. 1988) ........................................................25

*In re The Landing*
    156 B.R. 246 (Bankr. E.D. Mo. 1993) ......................................................22

*In re Lionel Corp.*
    722 F.2d 1063 (2d Cir. 1983) ...................................................................21

*In re Mama's Original Foods, Inc.*
    234 B.R. 500 (C.D. Cal. 1999) .................................................................22

*Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*
    36 B.R. 856 (Bankr. W.D. Mo. 1984) ......................................................26

*In re Net Data Centers*
    Case No. 15-12690-BB, Dkt. No. 259 (Bankr. CD Cal. Sep. 1, 2015) ..............31

*In re Paddlewheels, Inc.*
    2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ..................................27

*In re Pomare, Ltd.*
    No. 15-00203, 2015 WL 3523096 (Bankr. D. Haw. May 18, 2015).................31

*In re S.N.A. Nut Co.*
    186 B.R. 98 (Bankr. N.D. Ill. 1995) ........................................................30

*In re T Asset Acquisition Co., LLC*
    No. 2:09-31853-ER, 2010 WL 4689562 (Bankr. C.D. Cal. Jan. 28, 2010)......................14, 31

*Walter v. Sunwest Bank (In re Walter)*
    83 B.R. 14 (B.A.P. 9th Cir. 1988)............................................................22

*In re Wilde Horse Enterprises, Inc.*
    136 B.R. 830 (Bankr. C.D. Cal. 1991).......................................22, 24, 25

**Federal Statutes**

11 U.S.C.
    § 101 et seq. Chapter 11.....................................................8, 10, 12
    § 101(31)................................................................................25
    § 102(1)................................................................................20
    § 102(1)(A) ...........................................................................20
    § 363....................................................................................28
    § 363(b)...............................................................21, 22, 24
    § 363(b)(1)...........................................................................20, 25
    § 363(b)(2)...........................................................................20

§ 363(f)...................................................................................................................26
§ 363(f)(2).....................................................................................26, 27, 28
§ 363(f)(3)...........................................................................................................28
§ 363(m)...............................................................................................................25
§§ 1107 and 1108...............................................................................................8

**Other Authorities**

Fed.R.Bankr.P. 2002(a)(2)..............................................................................20
Fed. R. Bankr. P. 2002(c)(1)...........................................................................20
Fed.R.Bankr.P. 2002(k)...................................................................................20
Fed.R.Bankr.P. 6004(a)...................................................................................20
Fed. R. Bankr. P. 6004(f).................................................................................28
Fed.R.Bankr.P. 6004(h)...................................................................................32

## MEMORANDUM OF POINTS AND AUTHORITIES[3]

### I.

### STATEMENT OF FACTS

**A.    GENERAL BACKGROUND.**

On August 17, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[4]  The Debtor is operating its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.  An Official Committee of Unsecured Creditors has not been formed.

**B.    THE DEBTOR'S BUSINESS AND REAL PROPERTY.**

The Debtor is a Wyoming limited liability company that was formed in 2015.  The Debtor is in the business of acquiring distressed real property (each a "Property" and, collectively, the "Properties")  in situations where public records and documents available to the Debtor demonstrate that the claim allegedly secured by the underlying subject Property (each an "Alleged Secured Claim" and, collectively, the "Alleged Secured Claims") and the related trust deed purportedly securing the Alleged Secured Claim pursuant to a lien on the subject Property (each an "Alleged Lien" and, collectively, the "Alleged Secured Liens") suffer from defects rendering the Alleged Secured Claim and/or related Alleged Lien unenforceable and/or invalid.

In situations where the Debtor identifies a Property it is interested in acquiring, the Debtor seeks to enter into a group of agreements with the then owner of the Property (each a "Former Owner" and, collectively, the "Former Owners") intended to mutually benefit the Debtor and the Former Owner.  In a typical transaction in which the Debtor acquires a Property:

(1)    the Debtor and the Former Owner execute a Real Estate Shared-Equity Transaction & Purchase and Sale Agreement (each a "Purchase Agreement" and, collectively, the "Purchase Agreements") pursuant to which, among other things, the Former Owner sells the

---

[3] Capitalized terms not otherwise defined herein have the same meanings as in the preceding Motion.

[4] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

1  subject Property to the Debtor in exchange for an Unsecured Promissory Note (each an

2  "Unsecured Note" and, collectively, the "Unsecured Notes") from the Debtor in a mutually

3  agreed upon amount, which Unsecured Note is only payable in the event the Debtor is able to

4  eliminate the Alleged Lien on the Property (at the sole expense of the Debtor) thereby

5  increasing the equity in the Property, which is to be shared between the Former Owner and the

6  Debtor according to the terms of the subject Purchase Agreement and Unsecured Note;

7           (2)     the Former Owner executes a Grant Deed (or sometimes a Warranty Deed or

8  Quitclaim Deed) transferring title to the Property to the Debtor; and

9           (3)     the Debtor and the Former Owner execute a Month to Month Rental Agreement

10  (each a "Rental Agreement" and, collectively, the "Rental Agreements") whereby the Former

11  Owner leases back the Property from the Debtor.

12          Through the Petition Date, the Debtor acquired 42 Properties.  In the ordinary course of

13  its business, the Debtor acquired an additional Property after the Petition Date, and the Debtor

14  may acquire other Properties.  Thus, at present, the Debtor has an interest in 43 Properties.

15           Unfortunately, prior to the Petition Date, approximately 28 of the 43 Properties (each a

16  "Foreclosure Property" and, collectively, the "Foreclosure Properties") were purportedly

17  foreclosed upon.

18  **C.       THE DEBTOR'S ACQUISITION OF THE KEARSARGE PROPERTY.**

19          Consistent with the Debtor's business model, the Debtor and Darren and Danna Ladd

20  (together the "Ladds"), the Former Owner of the Kearsarge Property, entered into a Purchase

21  Agreement, the Debtor issued an Unsecured Note to the Ladds, the Ladds executed a Rental

22  Agreement, and the Ladds executed a Grant Deed transferring title to the Kearsarge Property to

23  the Debtor (the "Grant Deed").  A true and correct copy of the Grant Deed, which was recorded

24  with the Placer County Recorder as Document 2017-0013031-00, is attached hereto as **Exhibit**

25  **"3."**

26

27

28

**D.**      **THE REASONS FOR FILING BANKRUPTCY AND THE DEBTOR'S EXIT STRATEGY.**

On the Petition Date of August 17, 2017, the Debtor filed the instant Chapter 11 bankruptcy case in order to, *inter alia*, (1) address and resolve various claims against the Debtor, including, but not limited to the Alleged Secured Claims, (2) where necessary, invalidate purported pre-Petition Date foreclosures on the Foreclosure Properties and/or avoid alleged transfers pursuant to purported pre-Petition Date foreclosures on the Foreclosure Properties and recover title to the Foreclosed Properties, (3) facilitate the sale of the Debtor's Properties free and clear of all liens, claims, and interests, and (4) propose and confirm a Chapter 11 plan of reorganization.

As of the Petition Date, the Debtor intended (1) to initiate adversary proceedings (each an "Adversary" and, collectively, the "Adversary Proceedings") and/or claim objections (each a "Claim Objection" and, collectively, the "Claim Objections") to (a) invalidate, reverse, or avoid the purported foreclosures on the Foreclosure Properties and (b) challenge and eliminate all of the Alleged Secured Claims and related Alleged Liens, (2) to sell the resulting unencumbered Properties for the highest and best price (subject to any rights of first refusal a Former Owner may have to repurchase the subject Property), and (3) to propose and confirm a Plan whereby all allowed secured claims (which the Debtor believes will be limited to some tax claims against certain of the Properties), administrative claims, priority claims, and general unsecured claims (largely if not entirely comprised of amounts payable to the Former Owners pursuant to the Unsecured Notes) will be paid in full, with the surplus distributed to the Debtor's owners, which was the Debtor's original exit strategy.

While the Debtor disputes the enforceability and validity of the Alleged Secured Claims and Alleged Liens forming the purported basis for the foreclosures on the Foreclosure Properties and/or the standing of the parties effectuating the foreclosures and, therefore, the validity of the purported foreclosures on the Foreclosure Properties, the Debtor has decided to somewhat alter its original bankruptcy and exit strategy. More specifically, the Debtor took actions, including the initiation of Adversary Proceedings (which included Claim Objections),

in an effort to invalidate, reverse, or avoid the purported foreclosures on certain of the Foreclosure Properties and to challenge certain related the Alleged Secured Claims and Alleged Liens forming the purported basis for the foreclosures on the Foreclosure Properties. However, the Debtor, in an exercise of its business judgment, later determined that the cost of pursuing most other potential Adversary Proceedings and Claim Objections likely outweighed the benefit to be gained in such Adversary Proceedings and Claim Objections, particularly when considering prior results before this Court, the costs of litigating the Adversary Proceedings and Claim Objections, and the delay and risks inherent in litigating Adversary Proceedings and Claim Objections pertaining to the Foreclosed Properties that are the subject of the Rejected Purchase Agreements (as defined below).

Based on the foregoing, the Debtor, in an exercise of its business judgment, decided that it made better sense to reject nearly all of the Purchase Agreements relating to Foreclosed Properties (the "<u>Rejected Purchase Agreements</u>") and to instead focus on selling the 15 Properties that are non-Foreclosed Properties and continuing to litigate Adversary Proceedings and Claim Objections related to a limited number of the Foreclosed Properties.

The Debtor intends to seek to sell such non-Foreclosed Properties, such as the Kearsarge Property that is the subject of this Motion, free and clear of liens, claims, encumbrances, and interests (with certain exceptions), with such liens, claims, encumbrances, and interests attaching to the proceeds of sale. Once non-Foreclosed Properties, such as the Kearsarge Property that is the subject of this Motion, are sold, to the extent a consensual resolution cannot be reached regarding the disposition of sale proceeds as among the Debtor and any holders of Alleged Secured Claims and Alleged Secured Liens (and possibly any Former Owners), the Debtor will litigate, in contested Claim Objections or Adversary Proceedings, with the holders of Alleged Secured Claims and Alleged Secured Liens (and possibly any Former Owners) pertaining to the non-Foreclosed Properties, to determine their claims and, therefore, the appropriate distribution of the proceeds from the sale of the subject non-foreclosed Property.

The Debtor believes that the foregoing is more likely to result in a higher net benefit to the estate than litigating all Adversary Proceedings and Claim Objections regarding the

Foreclosed Properties.

## E.    ACTIONS BY THE DEBTOR IN FURTHERANCE OF ITS EXIT STRATEGY.

The Debtor already sought and obtained Court authority to reject the Rejected Purchase Agreements, each of which pertained to a Foreclosed Property.

In respect to non-Foreclosed Properties, in furtherance of the Debtor's exit strategy, the Debtor (1) obtained Court authority to employ the Broker as the Debtor's real estate broker to market and sell the Properties at the appropriate time [*see* Dkts. 33, 96, 255, and 264] and (2) with the assistance of the Broker, began to market certain of the non-Foreclosed Properties for sale, including the Kearsarge Property, as discussed in more detail below. The Debtor's Court-approved employment of the Broker provides for a 6% commission to be paid to the Broker and shared with the cooperating broker in connection with the sale of the Kearsarge Property [*see id.*].

Also in furtherance of the Debtor's exit strategy, the Debtor obtained a general claims bar date of May 4, 2018 (the "Bar Date") and provided notice thereof. [Dkt. 184] Notably, while the Former Owner of the Kearsarge Property was listed with a contingent unsecured claim, the Former Owner did not file a proof of claim before the Bar Date.

## F.    PRIOR AND ONGOING MARKETING EFFORTS REGARDING THE SALE OF THE KEARSARGE PROPERTY.

In furtherance of its efforts to market and sell the Kearsarge Property, the Broker (1) accessed and viewed the Kearsarge Property, (2) discussed the Kearsarge Property and related comparative sale data to come to agreement with the Debtor on a listing price, (3) photographed the Kearsarge Property, (4) on or about May 2, 2018 listed the Kearsarge Property on the MLS, which listing was followed by private showings. The Broker's marketing efforts resulted in numerous views on the MLS and other online platforms, a number of private showings, and multiple offers for the Kearsarge Property.

In addition to the foregoing, the Broker will continue to market the Kearsarge Property through the Auction date in an effort to attract Overbidders by, among other things, (1) continuing to respond to inquiries regarding the Kearsarge Property, (2) when possible,

1  continuing to conduct private showings to interested parties, (3) mailing or emailing a copy of

2  the Notice and this Motion and Memorandum, Declarations, and Exhibits, which include the

3  Overbid Procedures, to (a) all parties and/or the brokers of all parties that have provided contact

4  information to the Broker and have shown interest in the Kearsarge Property and (b) potential

5  interested parties in the Broker's email database, and (4) posting on the MLS basic information

6  about the Auction and Overbid Procedures (such as date and time of the auction and minimum

7  initial overbid amount) and contact information for the Debtor's counsel indicating that such

8  counsel can provide a copy of the Notice and this Motion and Memorandum, Declarations, and

9  Exhibits, which include the full, detailed Overbid Procedures.

10         In addition to the foregoing, as required by LBR 6004-1, concurrently with the filing

11  hereof, the Debtor will submit an additional copy of the Notice of the Motion, which include the

12  Overbid Procedures, with the Clerk of the Bankruptcy Court together with a Form F 6004-

13  2.NOTICE.SALE for purposes of publication.  LBR 6004-1(c)(3) and (f).

14         The efforts of the Debtor and the Broker to market and sell the Kearsarge Property

15  resulted in the Debtor receiving a number of signed offers for the Kearsarge Property.  The

16  Debtor engaged in rounds of counteroffers to such offers.  Ultimately, after considering the

17  purchase prices offered by the prospective buyers and other terms of proposed purchase

18  agreements, and based on consultation with its professionals, the Debtor accepted the offer from

19  the Buyer and entered into the Purchase Agreement, a true and correct copy of which is attached

20  hereto as **Exhibit "2."**

21         The Purchase Agreement is the result of arms-length negotiations.  Other than in

22  connection with the proposed sale of the Kearsarge Property, the Debtor and its principals have

23  no prior connections with and have never met the Buyer.

24  **G.    THE PROPOSED SALE OF THE KEARSARGE PROPERTY UNDER THE**

25      **PURCHASE AGREEMENT.**

26         The principal terms and conditions of the proposed sale of the Kearsarge Property to the

27  Buyer, subject to overbid, include the following:[5]

28  ---
[5] This is a summary only.  To the extent there is any inconsistency between this summary and the terms of the

13

1          •      Name of Buyer: Parker James Geisinger and Katelyn Joy Geisinger (*i.e.*,

2    the "Buyer").

3          •      Asset: The Kearsarge Property.

4          •      Purchase Price: $375,000 subject to overbid pursuant to the Overbid

5    Procedures.

6          •      Deposit: $11,250 (3% of the Purchase Price)

7          •      Estimated Costs of Sale: Total of 8% comprised of a 6% commission for

8    the Debtor's broker, plus any outstanding real property taxes, plus other customary closing

9    costs.

10         •      Condition of Asset/Property: "As-is" and "Where is."

11         •      Contingencies: The Purchase Agreement contained a due diligence period

12   that expired on July 2, 2018.  All contingencies have now been lifted other than the entry of

13   the Sale Order approving the sale of the Kearsarge Property to the Buyer.

14         •      Other Terms: The sale is subject to the Overbid Procedures and Break-Up

15   Fee set forth above.  Further, the Debtor's sale of the Kearsarge Property shall be free and

16   clear of any and all liens, claims, encumbrances, and interests, other than the Excepted

17   Items, which non-excepted liens, claims, encumbrances, and interests the Debtor believes

18   are limited to (a) Items 2-4 of the Title Report, which are liens securing for claims for

19   unpaid real property taxes owed to the County, which will be paid from escrow upon

20   closing, (b) Item 14 of the Title Report, which the Debtor believes is a lien allegedly

21   securing a claim for a prior loan from Capital Bank that was repaid, but which claim and

22   lien will attach to the proceeds from the sale of the Kearsarge Property with the same extent,

23   validity, and priority as such claim and lien had prior to the sale, (c) Item 16 of the Title

24   Report, which the Debtor believes is a purported lien allegedly securing an alleged loan

25   from Suntrust Mortgage ("Suntrust") that was later allegedly transferred to US Bank

26   National Association, as Trustee of the PRP II Pals Investments Trust ("US Bank"), but

27

28   Purchase Agreement, the terms of the Purchase Agreement shall govern.

1    which claim and lien, will attach to the proceeds from the sale of the Kearsarge Property

2    with the same extent, validity, and priority as such claim and lien had prior to the sale, (d)

3    Item 17 of the Title Report, which the Debtor believes is a lien allegedly securing a potential

4    claim for a line of credit from Beneficial California, Inc. ("Beneficial") that was either not

5    drawn on or repaid, but which claim and lien will attach to the proceeds from the sale of the

6    Kearsarge Property with the same extent, validity, and priority as such claim and lien had

7    prior to the sale, and (e) any unrecorded liens, claims, encumbrances, and interests..

8        • Potential Tax Consequences:  The Debtor will have to pay applicable

9    capital gains taxes stemming from the sale of the Kearsarge Property after applicable

10   deductions and exemptions.

11   **H.    ALLEGED   LIENS,   CLAIMS,   ENCUMBRANCES,   AND   INTERESTS**

12   **RECORDED AGAINST THE KEARSARGE PROPERTY.**

13       The Title Report for the Property is attached hereto as **Exhibit "1."**  Pursuant to the

14   Motion, the Debtor is seeking to sell the Kearsarge Property free and free and clear of all liens,

15   claims, encumbrances, and interests, with the exception of Items 1, 5-13, and 15 (the "Excepted

16   Items") set forth in the Title Report.  In other words, the Debtor will be selling free and clear of

17   (1) Items 2-4 of the Title Report, which are liens securing for claims for unpaid real property

18   taxes owed to the County, which total approximately $3,908.08 according to the Tile Report

19   and which will be paid from escrow upon closing, (2) Item 14 of the Title Report, which the

20   Debtor believes is a lien allegedly securing a claim for a prior loan from Capital Bank that was

21   repaid and is in the amount of $0, but which lien will attach to the proceeds from the sale of the

22   Kearsarge Property with the same extent, validity, and priority as such claim and lien had prior

23   to the sale, (3) Item 16 of the Title Report, which the Debtor believes is a purported lien

24   allegedly securing an alleged loan from Suntrust that was later allegedly transferred to US

25   Bank, but which claim and lien, will attach to the proceeds from the sale of the Kearsarge

26   Property with the same extent, validity, and priority as such claim and lien had prior to the sale;

27   based on the Notice of Default (the "NOD") sent on behalf of US Bank, a true and correct copy

28   of which is attached hereto as **Exhibit "4,"** the Debtor is informed and believes that US Bank

1    asserts a claim in the amount of $170,294.76, (4) Item 17 of the Title Report, which the Debtor

2    believes is a lien allegedly securing a potential claim for a line of credit from Beneficial in the

3    amount of up to $30,000 according to the Title Report that was either not drawn on or repaid,

4    but which claim and lien will attach to the proceeds from the sale of the Kearsarge Property

5    with the same extent, validity, and priority as such claim and lien had prior to the sale, and (5)

6    any unrecorded liens, claims, encumbrances, and interests.

7        As discussed, the claim of the County will be paid from escrow on closing.  The alleged

8    liens and claims of Capital Bank, US Bank, and Beneficial, with additional amounts for

9    adequate protection for potential additional claim amounts and charges, will attach to the

10   proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority as

11   such liens and claims had prior to the sale, as follows:

| | | |
|---|---|---|
| **Sale Price** | $ | **375,000.00** |
| **Costs of Sale** | | |
| Broker Commission (6% of Sale Price) | $ | (22,500.00) |
| Est. Closing Costs (2% of Sale Price) | $ | (7,500.00) |
| **Total Costs of Sale** | $ | (30,000.00) |
| **Balance** | $ | 345,000.00 |
| | | |
| **Alleged Secured Claims** | | |
| Real Property Taxes | $ | (3,908.08) |
| **Balance** | $ | 341,091.92 |
| Capital Bank | $ | - |
| **Balance** | $ | 341,091.92 |

Real Property Taxes Per Items 2-4 of the Title Report - Unpaid amounts to be paid from sale proceeds upon the close of escrow

Purported Secured Claim of Capital Bank Per Item 14 of the Title Report - The Title Report indicates that the subject lien and claim were satisfied and that the subject lien was reconveyed; thus, no amount to be paid to the creditor or reserved for the creditor.

16

| | | | | |
|---|---|---|---:|---|
| 1 | | US Bank | $ (190,294.76) | Purported Secured Claim of US Bank Per Item 16 of Title Report and NOD - The Debtor disputes the claim and lien, and US Bank did not file a proof of claim and is now barred from doing so; therefore, the Amount of $190,294.76 (US Bank's purported claim amount of $170,294.76, plus $20,000.00 to provide adequate protection for any additional purported interest and charges) will be maintained in a segregated trust account maintained by Debtor's counsel pending further order of the Court. |
| 7 | **Balance** | | **$ 150,797.16** | |
| 8 | | Beneficial | $ (35,000.00) | Purported Secured Claim of Beneficial Per Item 17 of Title Report - The Debtor disputes the claim and lien, and beneficial did not file a proof of claim and is now barred from doing so; therefore, the Amount of $35,000.00 (Beneficial's purported claim amount of $30,000.00, plus $5,000.00 to provide adequate protection for any additional purported interest and charges) will be maintained in a segregated trust account maintained by Debtor's counsel pending further order of the Court. |
| 14 | **Balance to the Estate** | | **$ 115,797** | This amount will increase to the extent, among other things, (1) the Debtor is able to negotiate a reduction in US Bank's purported claim based on the Debtor's objection to such claim and the Debtor's claim to surcharge US Bank's collateral for costs incurred by the estate in connection with the sale, including Broker commissions and closing costs, (2) Beneficial's purported claim has been paid down or satisfied in full, which the Debtor is seeking to ascertain, and (3) the additional reserve amounts of $20,000 and $5,000 for US Bank and Beneficial's alleged claims are not used.This amount may decrease to the extent funds are required to settle any alleged claims of the Former Owner of the Kearsarge Property against the Debtor (recognizing that the Former Owner did not file a proof of claim and is now barred from doing so and, in any event, at most would have an unsecured claim) and to ensure that the Former Owner, which is the current tenant of the Kearsarge Property, voluntarily turns over possession of the Kearsarge Property to the Buyer on the closing date. |

I.  **THE PROPOSED OVERBID PROCEDURES AND BREAK-UP FEE.**

The proposed Overbid Procedures and Break-Up Fee are as follows:

- **Date, Time, and Location of the Auction:** The Auction shall be held concurrently with the hearing on the Motion, as follows:

> **Date: August 7, 2018**
> **Time: 2:30 p.m.**
> **Place: Courtroom 1675**
> **255 E. Temple Street**
> **Los Angeles, CA  90012**

- **Initial Overbid Amount:** The Purchase Price of $375,000, plus *at least* $10,000 more (*i.e.*, at least $385,000) (the "Initial Overbid Amount");

- **Qualification of Overbidders:**  In order for any prospective Overbidder to have the right to bid at the Auction, the prospective Overbidder must, **within three (3) business days prior to the Auction**, (a) provide to counsel for the Debtor, Levene, Neale, Bender, Yoo & Brill L.L.P., c/o Todd M. Arnold, 10250 Constellation Boulevard, Suite 1700 Los Angeles, California 90067, Telephone: (310) 229-1234 Facsimile: (310) 229-1244, Email: tma@lnbyb.com ("LNBYB"), a signed proposed purchase agreement (each an "Overbid Purchase Agreement"), in substantially and materially the same form as the Purchase Agreement,[6] redlined to show any changes, with such purchase agreement not to contain any financing, inspection, due diligence, or other contingencies (other than the entry of the Sale Order approving the sale of the Kearsarge Property to the Overbidder), and including, a removal of all contingencies (other than the entry of the Sale Order approving the sale of the Kearsarge Property to the Overbidder) pursuant to CAR Form CR 14.C.), and with a minimum purchase price of at least the Initial Overbid Amount of $385,000; (b) submit a deposit in the amount of 10% of the Initial Overbid Amount set forth in the Overbid Purchase Agreement by cashiers' check or wire into a segregated trust account

---

[6] LNBYB will provide a copy of the Purchase Agreement in Word to any parties interested in submitting an Overbid.

1   maintained by LNBYB, who will provide wire instructions on requests; (c) demonstrate that

2   the prospective Overbidder has sufficient funds or financing to close the transaction within

3   fifteen (15) calendar days of the entry of the Sale Order approving the prospective

4   Overbidder and the sale of the Kearsarge Property to the Overbidder; and (d) agree that the

5   prospective Overbidder's deposit will be non-refundable if the prospective Overbidder is the

6   winning bidder at the Auction and fails to close the purchase of the Kearsarge Property

7   within fifteen (15) calendar following the date of entry of the Sale Order – regardless of

8   whether an appeal has been filed of the Sale Order, provided there is no entered stay

9   pending appeal of either of the foregoing orders (*i.e.*, no final order requirement); and

10   • **Overbidding Increments and Considerations in Determining the**

11   **Winning Bidder at Any Auction:**  In order to qualify to bid at the Auction, any Overbid

12   Purchase Agreement is required to include an Initial Overbid Amount of at least $385,000.

13   Subsequent overbids at the Auction must be in increments of $1,000 or amounts that are

14   wholly divisible by $1,000.  The Debtor, in consultation with its professionals, will select

15   the highest and best offer and recommend Court approval of the sale of the Kearsarge

16   Property to the Buyer or any qualified Overbidder that, in the opinion of the Debtor, in

17   consultation with its professionals, has made the highest and best offer for the Kearsarge

18   Property.

19   • **Break-Up Fee:**  In the event the Buyer is not the successful bidder at the

20   Auction and an Overbidder closes a purchase of the Kearsarge Property, the Debtor shall

21   pay a $5,000 Break-Up Fee (1.3% of the Purchase Price) to the Buyer upon the close of

22   escrow.

23

24   The Debtor believes that the proposed Overbid Procedures and Break-Up Fee, together

25   with efforts already undertaken by the Broker to market the Kearsarge Property and by the

26   Debtor and the estate to negotiate and enter into the Purchase Agreement, will result in the

27   Debtor and the estate receiving the highest and best price for the Kearsarge Property under the

28   circumstances.

## II.

## LEGAL ARGUMENT

**A.** **THE COURT SHOULD APPROVE THE SALE OF THE KEARSARGE PROPERTY TO THE BUYER, SUBJECT TO OVERBID, OR TO ANY WINNING OVERBIDDER AT AUCTION.**

**1.** **THE DEBTOR HAS OR WILL HAVE COMPLIED WITH ALL APPLICABLE NOTICE REQUIREMENTS.**

Section 363(b)(1) provides that the Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 102(1) defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances. 11 U.S.C. § 102(1)(A).

FRBP 6004(a) provides, in pertinent part, that notice of a proposed sale not in the ordinary course of business must be given pursuant to FRBP 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with Section 363(b)(2). Fed.R.Bankr.P. 6004(a). FRBP 2002(a)(2) requires at least 21 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the Court for cause shown shortens the time or directs another method of giving notice. Fed.R.Bankr.P. 2002(a)(2). FRBP 2002(c)(1) requires that the notice of a proposed sale include the date, time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. It also provides that the notice of sale or property is sufficient if it generally describes the property. Fed. R. Bankr. P. 2002(c)(1). FRBP 2002(k) requires that the notice be given to the United States Trustee. Fed.R.Bankr.P. 2002(k).

In addition, LBR 6004-1 requires that the notice contain the information specified in LBR 6004-1(c)(3) and that an additional copy of the notice be submitted to the Clerk of the Bankruptcy Court together with a Form F 6004-2.NOTICE.SALE at the time of filing for purposes of publication. LBR 6004-1(c)(3) and (f).

The Debtor has or will have complied with all of the above provisions of the Bankruptcy Code, the FRBP and the LBR. The Debtor has complied with FRBP 6004(a) and 2002(a)(2),

(c)(1), (i) and (k), as well as LBR 6004-1(c)(3), as far as practicable under the circumstances, because the Notice of the Motion includes all of the required information set forth above, including, without limitation, the date, time and place of the hearing on the Motion to approve the proposed sale of the Kearsarge Property to the Buyer, subject to overbid, the deadline for objecting to the Motion, the Auction date and Overbid Procedures, and related deadlines, and the Notice of the Motion has been served on the Office of the United States Trustee, the Debtor, all of the Debtor's known creditors, all parties appearing on the Title Report (even parties to the Excepted Items where addresses are available), and all parties requesting special notice. Further, the this Motion and its annexed Memorandum, Declarations, and Exhibits will be served on the Office of the United States Trustee, the Debtor, all parties appearing on the Title Report (even parties to the Excepted Items where addresses are available), and all parties requesting special notice. Additionally, the Notice of the Motion advises parties in interest how and where to obtain a full copy of this Motion and its annexed Memorandum, Declarations, and Exhibits.

Further, as required by LBR 6004-1(f), concurrently with the filing hereof, the Debtor submitted an additional copy of the Notice of the Motion, which include the Overbid Procedures, with the Clerk of the Bankruptcy Court together with a Form F 6004-2.NOTICE.SALE for purposes of publication.

Based on the foregoing, all applicable notice requirements have been satisfied.

**2.    THE SALE OF THE KEARSARGE PROPERTY TO THE BUYER, SUBJECT TO OVERBID, OR TO ANY WINNING OVERBIDDER AT AUCTION, SHOULD BE APPROVED, BECAUSE GOOD BUSINESS REASONS FOR THE SALE EXIST, THE PURCHASE PRICE FOR THE KEARSARGE PROPERTY IS FAIR AND REASONABLE, AND THE PROPOSED SALE IS IN THE BEST INTERESTS OF THE ESTATE AND CREDITORS.**

As a general matter, a Court considering a motion to approve a sale under Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). In addition, the Court must further find that the sale is in the best interest of the estate. To make this determination, a Court should consider whether:

1

2

(1)    the sale is fair and reasonable, *i.e.*, the price to be paid is adequate;

3

(2)    the property has been given adequate marketing;

(3)    the sale is in good faith, *i.e.*, there is an absence of any lucrative deals

4

with insiders, and

(4)    adequate notice has been provided to creditors.

5

6    *In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The*

7    *Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234

8    B.R. 500, 502-505 (C.D. Cal. 1999).  Here, the proposed sale of the Kearsarge Property to the

9    Buyer pursuant to the terms of the Purchase Agreement, or to successful Overbidder at the

10    Auction, satisfies each of these requirements.

11           **a.    <u>Sound Business Purpose</u>.**

12          The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*,

13    83 B.R. 14, 19 (B.A.P. 9th Cir. 1988) has adopted a flexible case-by-case test to determine

14    whether the business purpose for a proposed sale justifies disposition of property of the estate

15    under Section 363(b).  The facts pertaining to the sale at issue here amply substantiate the

16    Debtor's business decision that the contemplated sale of the Kearsarge Property to the Buyer

17    pursuant to the terms of the Purchase Agreement, or to successful Overbidder at the Auction,

18    serves the best interests of the estate and merits the approval of this Court.

19          As noted above, the Debtor's exit strategy now primarily focuses on (1) selling the non-

20    Foreclosed Properties, such as the Kearsarge Property, free and clear of liens, claims,

21    encumbrances, and interests (with certain exceptions), with such liens, claims, encumbrances,

22    and interests attaching to the proceeds of sale, (2) once non-Foreclosed Properties, such as the

23    Kearsarge Property, are sold, seeking to reach consensual resolutions with holders of Alleged

24    Secured Claims and Alleged Secured Liens (and possibly any Former Owners) regarding

25    alleged claims and liens pertaining to the subject non-Foreclosed Property, and (3) to the extent

26    a consensual resolutions cannot be reached, litigating, in contested Claim Objections or

27    Adversary Proceedings, to resolve such alleged claims and liens and, therefore, to determine the

28    appropriate distribution of the proceeds from the sale of the subject non-foreclosed Property.

1    Thus, the proposed sale furthers the Debtor's exit strategy.

2         In addition, as set forth in the chart in Section I.H above, even after (1) paying the costs

3    of sale, including the Broker commission, (2) paying outstanding secured property taxes, and

4    (3) setting aside sale proceeds equal to the face amounts of the alleged secured claims of Capital

5    Bank, US Bank, and Beneficial, plus additional amounts for adequate protection for any

6    potential additional amounts owed to the foregoing creditors, the estate will still net

7    approximately $115,000 in proceeds from the sale of the Kearsarge Property.

8         As also noted above, the net proceeds realized by the estate will increase to the extent,

9    among other things, (1) the Debtor is able to negotiate a reduction in US Bank's purported

10   claim based on the Debtor's objection to such claim and the Debtor's claim to surcharge US

11   Bank's collateral for costs incurred by the estate in connection with the sale, including Broker

12   commissions and closing costs, (2) Beneficial's purported claim has been paid down or satisfied

13   in full, which the Debtor is seeking to ascertain, and (3) the additional adequate protection

14   reserve amounts of $20,000 and $5,000 for US Bank and Beneficial's alleged claims are not

15   used.

16        However, the net proceed realized by the estate may decrease to the extent funds are

17   required to settle any alleged claims of the Former Owner of the Kearsarge Property against the

18   Debtor (recognizing that the Former Owner did not file a proof of claim and is now barred from

19   doing so and, in any event, at most would have an unsecured claim based on the Former

20   Owner's Unsecured Note) and to ensure that the Former Owner, which is the current tenant of

21   the Kearsarge Property, voluntarily turns over possession of the Kearsarge Property to the

22   Buyer on the closing date.

23        In addition to the foregoing, the sale of the Kearsarge Property will (1) substantially

24   curtail, if not stop, the accrual of any additional claims in favor of US Bank for additional

25   interest and (2) stop the accrual of additional secured property tax claims against the estate

26   related to the Kearsarge Property.

27        Based on the foregoing, the Debtor submits that the proposed sale of the Kearsarge

28   Property is in the best interests of the estate and its creditors and, therefore, represents a sound

1  exercise of the Debtor's business judgment.

2      **b.    Fair and Reasonable Price.**

3          In order for a sale to be approved under Section 363(b), the purchase price must be fair

4  and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).

5  The trustee is given substantial discretion in this regard.  *Id.*  In addition, Courts have broad

6  discretion with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer

7  Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the

8  ultimate purpose is to obtain the highest price for the property sold.  *Wilde Horse Enterprises,

9  Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha

10 Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

11         As noted above, the Debtor's Broker engaged in, and will continue to engage in,

12 expansive marketing efforts regarding the sale of the Kearsarge Property.    Those efforts

13 resulted in a number of signed offers for the Kearsarge Property.  The offer under the Purchase

14 Agreement represents the highest and best offer for the Kearsarge Property thus far that has

15 remained in escrow.  Further, the Overbid Procedures and Auction process proposed to be

16 implemented by the Debtor are specifically designed to ensure that the highest price possible is

17 obtained for Kearsarge Property.  Although the Debtor will not know the results of the Auction

18 (if one is conducted) until the Auction has been completed, based upon the marketing efforts by

19 the Debtor's highly experienced Broker after the Petition Date, which are outlined above and

20 which will continue through the Auction date, the Kearsarge Property will have been exposed to

21 those parties who are most likely to be interested in acquiring the Kearsarge Property, and the

22 highest and best bid obtained for the Kearsarge Property (whether it is the bid offered by the

23 Buyer or an Overbid submitted by a successful Overbidder) will constitute fair and reasonable

24 value for the Property.

25      **c.    Adequate Marketing.**

26         The intensive marketing efforts undertaken by the Debtor's Broker after the Petition Date,

27 which will continue through the Auction date, are set forth in detail above and are not repeated

28

1  here.  In consideration of the foregoing marketing efforts by the Debtor's Broker, the Kearsarge

2  Property has been, and will be, adequately marketed.

3            d.        **Good Faith.**

4            When a Bankruptcy Court authorizes a sale of assets pursuant to Section 363(b)(1), it is

5  required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts*

6  *Dairies*, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed

7  to circumvent creditor protections.  *Id.* at 150.  With respect to the Debtor's conduct in

8  conjunction with the proposed sale of the Property, the good faith requirement focuses

9  principally on whether there is any evidence of "fraud, collusion between the purchaser and

10 other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

11 *Abbotts Dairies*, 788 F.2d at 147; *Wilde Horse Enterprises*, 136 B.R. at 842.

12           Here, as discussed above, the Purchase Agreement is the result of arms-length

13 negotiations and, other than in connection with the proposed sale of the Kearsarge Property, the

14 Debtor and its principals have no prior connections with and have never met the Buyer.

15           Based on the foregoing, and because the Buyer has no affiliation with the Debtor other

16 than as set forth above and is not an "insider" of the Debtor as that term is defined in Section

17 101(31), the Debtor submits that there has been no fraud or collusion in connection with the

18 proposed sale of the Kearsarge Property.  Therefore, the good faith requirement has been

19 satisfied, and that the Buyer (or a successful Overbidder) should be deemed a "good faith"

20 purchaser under Section 363(m) and entitled to the benefits under Section 363(m).

21           e.        **Accurate and Reasonable Notice.**

22           The purpose of the notice is to provide an opportunity for objections and hearing before

23 the Court if there are objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988).  A

24 notice is sufficient if it includes the terms and conditions of the sale and if it states the time for

25 filing objections.  *Id.*

26           As set forth in detail in Paragraph II.A.1 above, the Debtor has complied with all of the

27 applicable notice provisions of the Bankruptcy Code, the FRBP and the LBR.  Thus, the Notice

28

1    of the Motion (and proposed sale of the Property) should be deemed adequate, accurate, and

2    reasonable by the Court.

3    **B.**    **THE COURT SHOULD APPROVE THE SALE OF THE KEARSARGE
     PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,**
4    **AND INTERESTS, OTHER THAN THE EXCEPTED ITEMS, TO THE BUYER
     OR ANY WINNING OVERBIDDER AT THE AUCTION.**
5
          The Bankruptcy Court has the power to authorize the sale of property free and clear of
6
     liens, claims, or interests.  *See* 11 U.S.C. § 363(f); *In re Gerwer*, 898 F.2d 730, 733 (9th Cir.
7
     1990).
8
          Section 363(f) permits a sale of property "free and clear of any interest in such property
9
     of an entity other than the estate" if *any one* of the following five conditions is met:
10

11          (1)    applicable nonbankruptcy law permits sale of such
                   property free and clear of such interest;
12

13          (2)    such entity consents;

14          (3)    such interest is a lien and the price at which such
                   property is to be sold is greater than the aggregate value
15                 of all liens on such property;

16          (4)    such interest is in bona fide dispute; or

17
            (5)    such entity could be compelled, in a legal or equitable
18                 proceeding, to accept a money satisfaction of such
                   interest.
19

20    11 U.S.C. § 363(f).  Section 363(f) is written in the disjunctive; thus, satisfaction of any one of

21    the five conditions is sufficient to sell property free and clear of liens.  *See e.g., Citicorp*

22    *Homeowners Services, Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988);

23    *Mutual Life Ins. Co. of New York v. Red Oak Farms, Inc. (In re Red Oak Farms, Inc.)*, 36 B.R.

24    856, 858 (Bankr. W.D. Mo. 1984).

25          In regard to Section 363(f)(2), the "consent" of an entity asserting an interest in the

26    property sought to be sold, as referenced in 11 U.S.C. § 363(f)(2), can be implied if such entity

27    fails to make a timely objection to the sale after receiving notice of the sale.  *In re Eliot,* 94 B.R.

28    343, 345 (E.D. Pa. 1988); *see also, In re Ex-Cel Concrete Company, Inc.*, 178 B.R. 198, 203

1  (B.A.P. 9th Cir. 1995) ("The issue here is whether there was consent or non-opposition by

2  Citicorp."); *In re Paddlewheels, Inc.*, 2007 WL 1035151 (Bankr. E.D.La. April 2, 2007) ("The

3  Sale Motion complies with section 363(f) of the Bankruptcy Code, in that the Trustee either

4  obtained the consent of Whitney to the sale of the Vessel to Purchaser or Whitney had no

5  objection to the Sale."); *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985) (implied consent is

6  sufficient to authorize a sale under § 363(f)(2)).

7      Here, as discussed above, the Debtor is not trying to sell free and clear of the Excepted

8  Items, which are Items 1, 5-13, and 15 of the Title Report.  Instead, the Debtor will be selling

9  free and clear of (1) Items 2-4 of the Title Report, which are liens securing for claims for unpaid

10 real property taxes owed to the County, which total approximately $3,908.08 according to the

11 Tile Report and which will be paid from escrow upon closing, (2) Item 14 of the Title Report,

12 which the Debtor believes is a lien allegedly securing a claim for a prior loan from Capital Bank

13 that was repaid and is in the amount of $0, but which lien will attach to the proceeds from the

14 sale of the Kearsarge Property with the same extent, validity, and priority as such claim and lien

15 had prior to the sale, (3) Item 16 of the Title Report, which the Debtor believes is a purported

16 lien allegedly securing an alleged loan from Suntrust that was later allegedly transferred to US

17 Bank, but which claim and lien, will attach to the proceeds from the sale of the Kearsarge

18 Property with the same extent, validity, and priority as such claim and lien had prior to the sale;

19 as noted above, based on the NOD sent on behalf of US Bank, a true and correct copy of which

20 is attached hereto as **Exhibit "4,"** the Debtor is informed and believes that US Bank asserts a

21 claim in the amount of $170,294.76, (4) Item 17 of the Title Report, which the Debtor believes

22 is a lien allegedly securing a potential claim for a line of credit from Beneficial in the amount of

23 up to $30,000 according to the Title Report that was either not drawn on or repaid, but which

24 claim and lien will attach to the proceeds from the sale of the Kearsarge Property with the same

25 extent, validity, and priority as such claim and lien had prior to the sale, and (5) any unrecorded

26 liens, claims, encumbrances, and interests.

27      As set forth in the chart in Section I.H above, the Purchase Price for the Kearsarge

28 Property greatly exceeds the aggregate value of the alleged liens against the Kearsarge Property,

1   plus, though not required by Section 363(f)(3), additional amounts to be set aside as adequate

2   protection for such liens pending further orders of the Court.  Based on the foregoing, and

3   because their alleged liens and claims will be paid or attach to the proceeds from the sale of the

4   Kearsarge Property with the same extent, validity, and priority as such liens and claims had

5   prior to the sale, the Kearsarge Property can be sold free and clear of the alleged liens, claims,

6   and interests of the County, Capital Bank, US Bank, and Beneficial pursuant to Section

7   363(f)(3).

8        Further, to the extent the County, Capital Bank, US Bank, and Beneficial do not object

9   to the proposed sale, such parties can be deemed to have consented to the proposed sale of the

10  Kearsarge Property, and the Kearsarge Property can be sold free and clear of the alleged liens,

11  claims, and interests of the County, Capital Bank, US Bank, and Beneficial pursuant to Section

12  363(f)(2).

13  **C.    THE COURT SHOULD APPROVE THE OVERBID PROCEDURES AND THE
         BREAK-UP FEE.**

14       FRBP 2002 and 6004 govern the scope of the notice to be provided in the event a

15  trustee elects to sell property of the estate under Section 363; however, with respect to the

16  procedures to be adopted in conducting a sale outside the ordinary course, FRBP 6004 provides

17  only that such sale may be by private sale or public auction, and requires only that the trustee

18  provide an itemized list of the property sold together with the prices received upon

19  consummation of the sale.  Fed. R. Bankr. P. 6004(f).

20       Neither the Bankruptcy Code nor the FRBP contain specific provisions with respect to

21  the procedures to be employed by a trustee in conducting a public or private sale.  Nonetheless,

22  as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective

23  of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest

24  price or greatest overall benefit possible for the estate."  *In re Atlanta Packaging Products,*

25  *Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the

26  need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher

27

28

1    offers and thus benefits the estate.  Therefore, the objective is 'to maximize bidding, not

2    restrict it.'"  *Id.*

3        The Debtor believes that the proposed Overbid Procedures, which are set forth in

4    Section I.I hereof, will maximize the price ultimately obtained for the Kearsarge Property

5    while still protecting the estate from parties who may wish to bid on the Kearsarge Property

6    but who are ultimately unable to consummate a purchase of the Kearsarge Property.  The

7    Overbid Procedures serve numerous legitimate purposes.  Among other things, the Overbid

8    Procedures will (1) foster competitive bidding among any serious potential purchasers, (2)

9    eliminate from consideration purchasers who would waste the estate's time because they would

10    not have the financial ability to consummate a purchase of the Kearsarge Property, and (3)

11    ensure that the highest possible price is obtained for the Kearsarge Property.

12        One of the Overbid Procedures provided under the Purchase Agreement is the payment

13    of the Break-Up Fee in the sum of $5,000 (1.3% of the Purchase Price) to the Buyer in the

14    event that the Buyer is not the winning bidder for the Property.  The Debtor submits that, under

15    the circumstances of this case, the proposed Break-Up Fee is reasonable and should be

16    approved.

17        A corollary to the principles noted by the Court in the *Atlanta Packaging Products* case

18    – that the objective of bankruptcy rules and the duty of the trustee or debtor with respect to

19    sales of assets is to obtain the highest price or greatest overall benefit possible for the estate –

20    is that the Court should not "cherry-pick" among contractual provisions, objecting to select

21    individual portions, if the agreement as a whole is supported by an articulated business

22    judgment.  At least one bankruptcy court has expressly applied this corollary to a transaction

23    including breakup and overbid provisions in the sale of the debtor's business.  In *In re*

24    *Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a

25    transaction including provisions relating to a breakup fee and minimum overbids.  In

26    responding to objections to other provisions of the agreement, the Court held that:

27            The Court is not to second guess the inclusion of some provisions
                as long as the Agreement as a whole is within reasonable business

28

1
2
3

> judgment, and the subject provisions do not distort the balance
> Congress struck in Chapter 11. *Cf. In re Ames Dep't Stores, Inc.,*
> *Eastern Retailers Service Corp., et al.*, 115 B.R. 34, 37-38 (Bankr.
> S.D.N.Y. 1990) (some contractual provisions may be justified by
> the need to attract a prospective investor.).

4

114 B.R. at 886.

5

A break-up fee like the one which is proposed to be paid to the Buyer in the event of a

6

successful sale of the Property to a party other than the Buyer has been approved by other

7

courts. In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who

8

placed the estate property in a sales configuration mode ... to attract other bidders to the

9

auction." *In re Financial News Network, Inc.*, 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991);

10

*see also In re Integrated Resources, Inc.*, 147 B.R. 650, 653 (S.D.N.Y. 1992), *app dismissed*

11

*on jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993) ["[a] break-up fee, or more appropriately, a

12

termination fee, is an incentive payment to a prospective purchaser with which a company fails

13

to consummate a transaction"]. Agreements to provide breakup fees are designed to

14

compensate the potential acquirer who serves as a catalyst or "stalking horse' which attracts

15

more favorable offers. *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995); *In re*

16

*995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

17

Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the

18

bidding. *In re S.N.A. Nut Co.*, 186 B.R. at 102. In the bankruptcy context, a break-up fee is

19

generally permissible "if reasonably related to the bidder's efforts and the transaction's

20

magnitude." *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *In re*

21

*995 Fifth Ave., supra,* 96 B.R. at 28. Generally speaking, whether the payment of a break-up

22

fee is appropriate is evaluated under the "business judgment rule." *In re S.N.A. Nut Co., supra*,

23

186 B.R. at 102. Under this rule, there is a presumption that, in making a business decision,

24

the debtor acted on an informed basis, in good faith and in the honest belief that the action

25

taken was in the best interest of the company.

26

In evaluating the appropriateness of a break-up fee, the appropriate question for the

27

Court to consider is "whether the break-up fee served any of three possible useful functions:

28

1  (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum

2  for other bidders to follow, or (3) to attract additional bidders." *In re Integrated Resources,*

3  *Inc.,* 147 B.R. at 662.  Further, LBR 6004-1(b)(6) provides that in making a request for

4  approval of a break-up fee, the debtor must provide evidence establishing that the fee is likely

5  to enhance the ultimate sale price and that the break-up fee is reasonable.

6  Here, the Break-Up Fee allowed the Debtor to attract and retain a potentially successful

7  bid from the Buyer.  That bid may give other potential Overbidders confidence to make

8  Overbids on the Property, which would enhance the ultimate sale price for the Property.

9  Without the Break-Up Fee, which was part of the package of consideration for the Purchase

10  Agreement, the Buyer would not have entered into the Purchase Agreement and there may not

11  have been any purchase price for the Property.  In addition to attracting the Buyer and serving

12  to enhance the price received for the Property, the Break-Up Fee also serves to establish a bid

13  minimum for any Overbids.  The Debtor submits that the Break-Up Fee equal to 1.3% of the

14  Purchase Price is reasonable and break-up fees of between 3% and 5% been approved in

15  numerous other cases.  *See e.g., In re T Asset Acquisition Co., LLC*, No. 2:09-31853-ER, 2010

16  WL 4689562, at *2 (Bankr. C.D. Cal. Jan. 28, 2010) (approving 3% break-up fee as

17  reasonable); *In re Pomare, Ltd.*, No. 15-00203, 2015 WL 3523096, at *4 (Bankr. D. Haw. May

18  18, 2015) (approving 5% break-up fee as reasonable); *In re Net Data Centers*, Case No. 15-

19  12690-BB, Dkt. No. 259 (Bankr. CD Cal. Sep. 1, 2015) (approving 5% break-up fee as

20  reasonable).

21  Based on the foregoing, the Debtor submits that the proposed Overbid Procedures,

22  including the proposed Break-Up Fee, are reasonable and in the best interests of the estate and,

23  therefore, should be approved.

24  **D.**    **THE COURT SHOULD APPROVE THE PAYMENT OF CERTAIN CLAIMS
       FROM SALE PROCEEDS UPON THE CLOSE OF THE SALE OF THE
25     KEARSARGE PROPERTY.**

26  LBR 6004-1(h) provides as follows:

27  A disbursement of proceeds [from a sale of estate property] must
   not be made without a specific order of the court authorizing the

28

31

disbursement, *except* for payment to secured creditors, payment to a debtor of exempt proceeds, and payment for expenses of sale. Proceeds may be disbursed to pay auctioneer's fees and brokers' commissions without additional order of the court if payment is consistent with the terms of the order approving the sale or authorizing the employment of the auctioneer or broker.

LBR 6004-1(h).

Here, pursuant to the Motion, the Debtor is requesting authority for the Debtor to pay from the proceeds of the sale of the Kearsarge Property (1) any pre-closing real property taxes secured by the Kearsarge Property allocated to the Debtor, (2) the 6% commission owed to the Debtor's Broker and any cooperating broker, pursuant to the Purchase Agreement and the Debtor's application to employ the Broker, which was approved by the Court [*see* Dkts. 33, 96, 255, and 264], and (3) any other customary escrow closing fees and charges allocated to the Debtor. All of the foregoing payments are consistent with allowed disbursements of sale proceeds under LBR 6004-1(h).

## E.    THE COURT SHOULD WAIVE THE 14-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULES 6004(h).

FRBP 6004(h) provides, among other things, that an "order authorizing the … sale … of property . . . is stayed until the expiration of 14 days after entry of the court order, unless the court orders otherwise." Fed.R.Bankr.P. 6004(h).

The Debtor's goals under its new exit strategy was and is to, among other things, market and sell the non-Foreclosed Properties, including the Kearsarge Property that is the subject hereof, for the highest and best price possible and then to quickly proceed with (1) efforts to resolve any disputed secured or other claims related to the Kearsarge Property and (2) payment of allowed secured claims related to the Kearsarge Property in full. Waiver of the stay under FRBP 6004(h) will further these goals by allowing for an expedited closing of the proposed sale decreasing the chances that the Buyer (or successful Overbidder at the Auction) fails to close due to the passage of time.

Based on the foregoing, the Debtor requests that the Court waive the stay under FRBP 6004(h) and that the Sale Order be effective immediately upon entry.

1

### III.

2

### <u>CONCLUSION</u>

3     **WHEREFORE**, the Debtor respectfully requests that this Court enter a Sale Order

4     providing the relief requested in paragraphs (1) through (5) of the preceding Notice of Motion

5     and Motion.

6     Dated: July 12, 2018                    GRAND VIEW FINANCIAL, LLC

7

8                                              By: _*/s/ Todd M. Arnold*_____
                                                   TODD M. ARNOLD
9                                                  LEVENE, NEALE, BENDER, YOO
                                                      & BRILL L.L.P.
10                                                 Attorneys for Debtor and
                                                   Debtor in Possession
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF STEVE ROGERS

I, STEVE ROGERS, hereby declare as follows:

1.      I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Managing Member and Vice President of Grand View Financial, LLC, the debtor and debtor in possession herein (the "Debtor").   I am familiar with the Debtor's books and records maintained in the ordinary course of the Debtor's business, the Debtor's bank accounts, and the Debtor's business and operations.

3.      I make this Declaration in support of the Motion to which this Declaration is attached.   Unless otherwise stated, all capitalized terms herein have the same meaning as in the Motion.

4.      On August 17, 2017 (the "Petition Date"), the Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11.   The Debtor is operating its estate and managing its financial affairs as a debtor in possession pursuant to Sections 1107 and 1108.   An Official Committee of Unsecured Creditors has not been formed.

5.      The Debtor is a Wyoming limited liability company that was formed in 2015. The Debtor is in the business of acquiring distressed real property (each a "Property" and, collectively, the "Properties")  in situations where public records and documents available to the Debtor demonstrate that the claim allegedly secured by the underlying subject Property (each an "Alleged Secured Claim" and, collectively, the "Alleged Secured Claims") and the related trust deed purportedly securing the Alleged Secured Claim pursuant to a lien on the subject Property (each an "Alleged Lien" and, collectively, the "Alleged Secured Liens") suffer from defects rendering the Alleged Secured Claim and/or related Alleged Lien unenforceable and/or invalid.

6.       In situations where the Debtor identifies a Property it is interested in acquiring, the Debtor seeks to enter into a group of agreements with the then owner of the Property (each a "Former Owner" and, collectively, the "Former Owners") intended to mutually benefit the Debtor and the Former Owner.  In a typical transaction in which the Debtor acquires a Property:

a.      the Debtor and the Former Owner execute a Real Estate Shared-Equity Transaction & Purchase and Sale Agreement (each a "Purchase Agreement" and, collectively, the "Purchase Agreements") pursuant to which, among other things, the Former Owner sells the subject Property to the Debtor in exchange for an Unsecured Promissory Note (each an "Unsecured Note" and, collectively, the "Unsecured Notes") from the Debtor in a mutually agreed upon amount, which Unsecured Note is only payable in the event the Debtor is able to eliminate the Alleged Lien on the Property (at the sole expense of the Debtor) thereby increasing the equity in the Property, which is to be shared between the Former Owner and the Debtor according to the terms of the subject Purchase Agreement and Unsecured Note;

b.      the Former Owner executes a Grant Deed (or sometimes a Warranty Deed or Quitclaim Deed) transferring title to the Property to the Debtor; and

c.      the Debtor and the Former Owner execute a Month to Month Rental Agreement (each a "Rental Agreement" and, collectively, the "Rental Agreements") whereby the Former Owner leases back the Property from the Debtor.

7.      Through the Petition Date, the Debtor acquired 42 Properties.  In the ordinary course of its business, the Debtor acquired an additional Property after the Petition Date, and the Debtor may acquire other Properties.  Thus, at present, the Debtor has an interest in 43 Properties.

8.      Unfortunately, prior to the Petition Date, approximately 28 of the 43 Properties (each a "Foreclosure Property" and, collectively, the "Foreclosure Properties") were purportedly foreclosed upon.

9.      Consistent with the Debtor's business model, the Debtor and Darren and Danna Ladd (together the "Ladds"), the Former Owner of the Kearsarge Property, entered into a Purchase Agreement, the Debtor issued an Unsecured Note to the Ladds, the Ladds executed a Rental Agreement, and the Ladds executed a Grant Deed transferring title to the Kearsarge Property to the Debtor (the "Grant Deed").  A true and correct copy of the Grant Deed, which was recorded with the Placer County Recorder as Document 2017-0013031-00, is attached

hereto as **Exhibit "3."**

10.    On the Petition Date of August 17, 2017, the Debtor filed the instant Chapter 11 bankruptcy case in order to, *inter alia*, (1) address and resolve various claims against the Debtor, including, but not limited to the Alleged Secured Claims, (2) where necessary, invalidate purported pre-Petition Date foreclosures on the Foreclosure Properties and/or avoid alleged transfers pursuant to purported pre-Petition Date foreclosures on the Foreclosure Properties and recover title to the Foreclosed Properties, (3) facilitate the sale of the Debtor's Properties free and clear of all liens, claims, and interests, and (4) propose and confirm a Chapter 11 plan of reorganization.

11.    As of the Petition Date, the Debtor intended (1) to initiate adversary proceedings (each an "Adversary" and, collectively, the "Adversary Proceedings") and/or claim objections (each a "Claim Objection" and, collectively, the "Claim Objections") to (a) invalidate, reverse, or avoid the purported foreclosures on the Foreclosure Properties and (b) challenge and eliminate all of the Alleged Secured Claims and related Alleged Liens, (2) to sell the resulting unencumbered Properties for the highest and best price (subject to any rights of first refusal a Former Owner may have to repurchase the subject Property), and (3) to propose and confirm a Plan whereby all allowed secured claims (which the Debtor believes will be limited to some tax claims against certain of the Properties), administrative claims, priority claims, and general unsecured claims (largely if not entirely comprised of amounts payable to the Former Owners pursuant to the Unsecured Notes) will be paid in full, with the surplus distributed to the Debtor's owners, which was the Debtor's original exit strategy.

12.    While the Debtor disputes the enforceability and validity of the Alleged Secured Claims and Alleged Liens forming the purported basis for the foreclosures on the Foreclosure Properties and/or the standing of the parties effectuating the foreclosures and, therefore, the validity of the purported foreclosures on the Foreclosure Properties, the Debtor has decided to somewhat alter its original bankruptcy and exit strategy.  More specifically, the Debtor took actions, including the initiation of Adversary Proceedings (which included Claim Objections), in an effort to invalidate, reverse, or avoid the purported foreclosures on certain of the

Foreclosure Properties and to challenge certain related the Alleged Secured Claims and Alleged Liens forming the purported basis for the foreclosures on the Foreclosure Properties.  However, the Debtor, in an exercise of its business judgment, later determined that the cost of pursuing most other potential Adversary Proceedings and Claim Objections likely outweighed the benefit to be gained in such Adversary Proceedings and Claim Objections, particularly when considering prior results before this Court, the costs of litigating the Adversary Proceedings and Claim Objections, and the delay and risks inherent in litigating Adversary Proceedings and Claim Objections pertaining to the Foreclosed Properties that are the subject of the Rejected Purchase Agreements (as defined below).

13.    Based on the foregoing, the Debtor, in an exercise of its business judgment, decided that it made better sense to reject nearly all of the Purchase Agreements relating to Foreclosed Properties (the "Rejected Purchase Agreements") and to instead focus on selling the 15 Properties that are non-Foreclosed Properties and continuing to litigate Adversary Proceedings and Claim Objections related to a limited number of the Foreclosed Properties.

14.    The Debtor intends to seek to sell such non-Foreclosed Properties, such as the Kearsarge Property that is the subject of this Motion, free and clear of liens, claims, encumbrances, and interests (with certain exceptions), with such liens, claims, encumbrances, and interests attaching to the proceeds of sale.  Once non-Foreclosed Properties, such as the Kearsarge Property that is the subject of this Motion, are sold, to the extent a consensual resolution cannot be reached regarding the disposition of sale proceeds as among the Debtor and any holders of Alleged Secured Claims and Alleged Secured Liens (and possibly any Former Owners), the Debtor will litigate, in contested Claim Objections or Adversary Proceedings, with the holders of Alleged Secured Claims and Alleged Secured Liens (and possibly any Former Owners) pertaining to the non-Foreclosed Properties, to determine their claims and, therefore, the appropriate distribution of the proceeds from the sale of the subject non-foreclosed Property.

15.    I believe that the foregoing is more likely to result in a higher net benefit to the estate than litigating all Adversary Proceedings and Claim Objections regarding the Foreclosed Properties.

16.     The Debtor already sought and obtained Court authority to reject the Rejected Purchase Agreements, each of which pertained to a Foreclosed Property.

17.     In respect to non-Foreclosed Properties, in furtherance of the Debtor's exit strategy, the Debtor (1) obtained Court authority to employ the Broker as the Debtor's real estate broker to market and sell the Properties at the appropriate time [*see* Dkts. 33, 96, 255, and 264] and (2) with the assistance of the Broker, began to market certain of the non-Foreclosed Properties for sale, including the Kearsarge Property, as discussed in more detail below.  The Debtor's Court-approved employment of the Broker provides for a 6% commission to be paid to the Broker and shared with the cooperating broker in connection with the sale of the Kearsarge Property [*see id.*].

18.     Also in furtherance of the Debtor's exit strategy, the Debtor obtained a general claims bar date of May 4, 2018 (the "Bar Date") and provided notice thereof.  [Dkt. 184] Notably, while the Former Owner of the Kearsarge Property was listed with a contingent unsecured claim, the Former Owner did not file a proof of claim before the Bar Date.

19.     I am informed and believe that, in furtherance of the Debtor's efforts to market and sell the Kearsarge Property, the Broker (1) accessed and viewed the Kearsarge Property, (2) discussed the Kearsarge Property and related comparative sale data to come to agreement with the Debtor on a listing price, (3) photographed the Kearsarge Property, (4) on or about May 2, 2018 listed the Kearsarge Property on the MLS, which listing was followed by private showings.  I am informed and believe that, the Broker's marketing efforts resulted in numerous views on the MLS and other online platforms, a number of private showings, and I know that the Broker's marketing efforts resulted in multiple offers for the Kearsarge Property.

20.     In addition to the foregoing, I am informed and believe that the Broker will continue to market the Kearsarge Property through the Auction date in an effort to attract Overbidders by, among other things, (1) continuing to respond to inquiries regarding the Kearsarge Property, (2) when possible, continuing to conduct private showings to interested parties, (3) mailing or emailing a copy of the Notice and this Motion and Memorandum, Declarations, and Exhibits, which include the Overbid Procedures, to (a) all parties and/or the

1    brokers of all parties that have provided contact information to the Broker and have shown

2    interest in the Kearsarge Property and (b) potential interested parties in the Broker's email

3    database, and (4) posting on the MLS basic information about the Auction and Overbid

4    Procedures (such as date and time of the auction and minimum initial overbid amount) and

5    contact information for the Debtor's counsel indicating that such counsel can provide a copy of

6    the Notice and this Motion and Memorandum, Declarations, and Exhibits, which include the

7    full, detailed Overbid Procedures.

8        21.    The efforts of the Debtor and the Broker to market and sell the Kearsarge

9    Property resulted in the Debtor receiving a number of signed offers for the Kearsarge Property.

10   The Debtor engaged in rounds of counteroffers to such offers.  Ultimately, after considering the

11   purchase prices offered by the prospective buyers and other terms of proposed purchase

12   agreements, and based on consultation with its professionals, the Debtor accepted the offer from

13   the Buyer and entered into the Purchase Agreement, a true and correct copy of which is attached

14   hereto as **Exhibit "2."**

15       22.    The Purchase Agreement is the result of arms-length negotiations.  Other than in

16   connection with the proposed sale of the Kearsarge Property, the Debtor and its principals have

17   no prior connections with and has never met the Buyer.

18       23.    The Title Report for the Property is attached hereto as **Exhibit "1."**  Pursuant to

19   the Motion, the Debtor is seeking to sell the Kearsarge Property free and free and clear of all

20   liens, claims, encumbrances, and interests, with the exception of Items 1, 5-13, and 15 (the

21   "Excepted Items") set forth in the Title Report.  In other words, the Debtor will be selling free

22   and clear of (1) Items 2-4 of the Title Report, which are liens securing for claims for unpaid real

23   property taxes owed to the County, which total approximately $3,908.08 according to the Tile

24   Report and which will be paid from escrow upon closing, (2) Item 14 of the Title Report, which

25   I believe is a lien allegedly securing a claim for a prior loan from Capital Bank that was repaid

26   and is in the amount of $0, but which lien will attach to the proceeds from the sale of the

27   Kearsarge Property with the same extent, validity, and priority as such claim and lien had prior

28   to the sale, (3) Item 16 of the Title Report, which I believe is a purported lien allegedly securing

1   an alleged loan from Suntrust that was later allegedly transferred to US Bank, but which claim

2   and lien, will attach to the proceeds from the sale of the Kearsarge Property with the same

3   extent, validity, and priority as such claim and lien had prior to the sale; based on the Notice of

4   Default (the "<u>NOD</u>") sent on behalf of US Bank, a true and correct copy of which is attached

5   hereto as **Exhibit "4,"** I am informed and believes that US Bank asserts a claim in the amount

6   of $170,294.76, (4) Item 17 of the Title Report, which I believe is a lien allegedly securing a

7   potential claim for a line of credit from Beneficial in the amount of up to $30,000 according to

8   the Title Report that was either not drawn on or repaid, but which claim and lien will attach to

9   the proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority

10   as such claim and lien had prior to the sale, and (5) any unrecorded liens, claims, encumbrances,

11   and interests.

12       24.   As discussed, the claim of the County will be paid from escrow on closing.  The

13   alleged liens and claims of Capital Bank, US Bank, and Beneficial, with additional amounts for

14   adequate protection for potential additional claim amounts and charges, will attach to the

15   proceeds from the sale of the Kearsarge Property with the same extent, validity, and priority as

16   such liens and claims had prior to the sale, as follows:

| | | | |
|---|---|---:|---|
| **Sale Price** | $ | 375,000.00 | |
| **Costs of Sale** | | | |
|   Broker Commission (6% of Sale Price) | $ | (22,500.00) | |
|   Est. Closing Costs (2% of Sale Price) | $ | (7,500.00) | |
| **Total Costs of Sale** | $ | (30,000.00) | |
| **Balance** | $ | 345,000.00 | |
| | | | |
| **Alleged Secured Claims** | | | |
|   Real Property Taxes | $ | (3,908.08) | Real Property Taxes Per Items 2-4 of the Title Report - Unpaid amounts to be paid from sale proceeds upon the close of escrow |
| **Balance** | $ | 341,091.92 | |
|   Capital Bank | $ | - | Purported Secured Claim of Capital Bank Per Item 14 of the Title Report - The Title Report indicates that the subject lien and claim were satisfied and that the subject lien was reconveyed; thus, no amount to be paid to the creditor or reserved for the creditor. |
| **Balance** | $ | 341,091.92 | |

| | | | | |
|---|---|---|---|---|
| 1 | | US Bank | $ | (190,294.76) |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | **Balance** | | **$** | **150,797.16** |
| 8 | | Beneficial | $ | (35,000.00) |
| 14 | **Balance to the Estate** | | **$** | **115,797** |

1 — Purported Secured Claim of US Bank Per Item 16 of Title Report and NOD - The Debtor disputes the claim and lien, and US Bank did not file a proof of claim and is now barred from doing so; therefore, the Amount of $190,294.76 (US Bank's purported claim amount of $170,294.76, plus $20,000.00 to provide adequate protection for any additional purported interest and charges) will be maintained in a segregated trust account maintained by Debtor's counsel pending further order of the Court.

8 — Purported Secured Claim of Beneficial Per Item 17 of Title Report - The Debtor disputes the claim and lien, and beneficial did not file a proof of claim and is now barred from doing so; therefore, the Amount of $35,000.00 (Beneficial's purported claim amount of $30,000.00, plus $5,000.00 to provide adequate protection for any additional purported interest and charges) will be maintained in a segregated trust account maintained by Debtor's counsel pending further order of the Court.

14 — This amount will increase to the extent, among other things, (1) the Debtor is able to negotiate a reduction in US Bank's purported claim based on the Debtor's objection to such claim and the Debtor's claim to surcharge US Bank's collateral for costs incurred by the estate in connection with the sale, including Broker commissions and closing costs, (2) Beneficial's purported claim has been paid down or satisfied in full, which the Debtor is seeking to ascertain, and (3) the additional reserve amounts of $20,000 and $5,000 for US Bank and Beneficial's alleged claims are not used.This amount may decrease to the extent funds are required to settle any alleged claims of the Former Owner of the Kearsarge Property against the Debtor (recognizing that the Former Owner did not file a proof of claim and is now barred from doing so and, in any event, at most would have an unsecured claim) and to ensure that the Former Owner, which is the current tenant of the Kearsarge Property, voluntarily turns over possession of the Kearsarge Property to the Buyer on the closing date.

41

25.     I believe that the proposed Overbid Procedures and Break-Up Fee described in the Motion, together with efforts already undertaken by the Broker to market the Kearsarge Property and by the Debtor and the estate to negotiate and enter into the Purchase Agreement, will result in the Debtor and the estate receiving the highest and best price for the Kearsarge Property under the circumstances.

26.     As noted above, the Debtor's exit strategy now primarily focuses on (1) selling the non-Foreclosed Properties, such as the Kearsarge Property, free and clear of liens, claims, encumbrances, and interests (with certain exceptions), with such liens, claims, encumbrances, and interests attaching to the proceeds of sale, (2) once non-Foreclosed Properties, such as the Kearsarge Property, are sold, seeking to reach consensual resolutions with holders of Alleged Secured Claims and Alleged Secured Liens (and possibly any Former Owners) regarding alleged claims and liens pertaining to the subject non-Foreclosed Property, and (3) to the extent a consensual resolutions cannot be reached, litigating, in contested Claim Objections or Adversary Proceedings, to resolve such alleged claims and liens and, therefore, to determine the appropriate distribution of the proceeds from the sale of the subject non-foreclosed Property. The proposed sale furthers the Debtor's exit strategy.

27.     In additions, the sale of the Kearsarge Property will (1) substantially curtail, if not stop, the accrual of any additional claims in favor of US Bank for additional interest and (2) stop the accrual of additional secured property tax claims against the estate related to the Kearsarge Property.

28.     Based on the foregoing, I submit that the proposed sale of the Kearsarge Property is in the best interests of the estate and its creditors and, therefore, represents a sound exercise of the Debtor's business judgment.

29.     As noted above, the Debtor's Broker engaged in, and will continue to engage in, expansive marketing efforts regarding the sale of the Kearsarge Property.  Those efforts resulted in a number of signed offers for the Kearsarge Property.  The offer under the Purchase Agreement represents the highest and best offer for the Kearsarge Property thus far that has remained in escrow.  Further, the Overbid Procedures and Auction process proposed to be

1  implemented by the Debtor are specifically designed to ensure that the highest price possible is

2  obtained for Kearsarge Property.  Although the Debtor will not know the results of the Auction

3  (if one is conducted) until the Auction has been completed, based upon the marketing efforts by

4  the Debtor's highly experienced Broker after the Petition Date, which are outlined above and

5  which will continue through the Auction date, the Kearsarge Property will have been exposed to

6  those parties who are most likely to be interested in acquiring the Kearsarge Property, and the

7  highest and best bid obtained for the Kearsarge Property (whether it is the bid offered by the

8  Buyer or an Overbid submitted by a successful Overbidder) will constitute fair and reasonable

9  value for the Property.

10      30.    As discussed above, the Purchase Agreement is the result of arms-length

11  negotiations and, other than in connection with the proposed sale of the Kearsarge Property, the

12  Debtor and its principals (which are limited to me and Robert Sedlar) have no prior connections

13  with and have never met the Buyer.

14      31.    Based on the foregoing, and because the Buyer has no affiliation with the Debtor

15  other than as set forth above and is not an "insider" of the Debtor as that term is defined in

16  Section 101(31), I submit that there has been no fraud or collusion in connection with the

17  proposed sale of the Kearsarge Property.

18      32.    I believe that the proposed Overbid Procedures, which are set forth in Section I.I

19  hereof, will maximize the price ultimately obtained for the Kearsarge Property while still

20  protecting the estate from parties who may wish to bid on the Kearsarge Property but who are

21  ultimately unable to consummate a purchase of the Kearsarge Property.  The Overbid

22  Procedures serve numerous legitimate purposes.  Among other things, the Overbid Procedures

23  will (1) foster competitive bidding among any serious potential purchasers, (2) eliminate from

24  consideration purchasers who would waste the estate's time because they would not have the

25  financial ability to consummate a purchase of the Kearsarge Property, and (3) ensure that the

26  highest possible price is obtained for the Kearsarge Property.

27      33.    One of the Overbid Procedures provided under the Purchase Agreement and Sale

28  Order is the payment of the Break-Up Fee in the sum of $5,000 (1.33% of the Purchase Price) to

1  the Buyer in the event that the Buyer is not the winning bidder for the Property. I submit that,

2  under the circumstances of this case, the proposed Break-Up Fee is reasonable and should be

3  approved.

4       34.   Here, the Break-Up Fee allowed the Debtor to attract and retain a potentially

5  successful bid from the Buyer. That bid may give other potential Overbidders confidence to

6  make Overbids on the Property, which would enhance the ultimate sale price for the Property.

7  Without the Break-Up Fee, which was part of the package of consideration for the Purchase

8  Agreement, the Buyer would not have entered into the Purchase Agreement and there may not

9  have been any purchase price for the Property. In addition to attracting the Buyer and serving to

10  enhance the price received for the Property, the Break-Up Fee also serves to establish a bid

11  minimum for any Overbids. I submit that the Break-Up Fee equal to 1.3% of the Purchase Price

12  is reasonable.

13       35.   Based on the foregoing, I submit that the proposed Overbid Procedures,

14  including the proposed Break-Up Fee, are reasonable and in the best interests of the estate and,

15  therefore, should be approved.

16       I declare and verify under penalty of perjury that the foregoing is true and correct to the

17  best of my knowledge.

18       Executed on this 11th day of July 2018, at Minden, Nevada.

19

20

21  STEVE ROGERS

22

23

24

25

26

27

28

## <u>DECLARATION OF W. DARROW FIEDLER</u>

I, W. DARROW FIEDLER, do hereby declare:

1.      I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am a California-licensed real estate broker with Keller Williams Realty and KW Commercial located at 23670 Hawthorne Blvd., Suite 100, Torrance, California ("<u>Primary Broker</u>"), whose employment, together with the employment of associated Keller Williams Realty and KW Commercial offices located throughout the United States ("<u>Associated Brokers</u>" and, together with Primary Broker, the "<u>Broker</u>"), was approved by the Court. and

3.      I make this Declaration in support of the Motion to which this Declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meaning as in the Motion.

4.      In respect to non-Foreclosed Properties, in furtherance of the Debtor's exit strategy, the Debtor (1) obtained Court authority to employ the Broker as the Debtor's real estate broker to market and sell the Properties at the appropriate time [*see* Dkts. 33, 96, 255, and 264] and (2) with the assistance of the Broker, began to market certain of the non-Foreclosed Properties for sale, including the Kearsarge Property, as discussed in more detail below.  The Debtor's Court-approved employment of the Broker provides for a 6% commission to be paid to the Broker and shared with the cooperating broker in connection with the sale of the Kearsarge Property [*see id.*].

5.      In furtherance of the Debtor's efforts to market and sell the Kearsarge Property, the Broker (1) accessed and viewed the Kearsarge Property, (2) discussed the Kearsarge Property and related comparative sale data to come to agreement with the Debtor on a listing price, (3) photographed the Kearsarge Property, (4) on or about May 2, 2018 listed the Kearsarge Property on the MLS, which listing was followed by private showings.  The Broker's marketing efforts resulted in numerous views on the MLS and other online platforms, a number of private showings, and resulted in multiple offers for the Kearsarge Property.

6.      In addition to the foregoing, the Broker will continue to market the Kearsarge Property through the Auction date in an effort to attract Overbidders by, among other things, (1) continuing to respond to inquiries regarding the Kearsarge Property, (2) when possible, continuing to conduct private showings to interested parties, (3) mailing or emailing a copy of the Notice and this Motion and Memorandum, Declarations, and Exhibits, which include the Overbid Procedures, to (a) all parties and/or the brokers of all parties that have provided contact information to the Broker and have shown interest in the Kearsarge Property and (b) potential interested parties in the Broker's email database, and (4) posting on the MLS basic information about the Auction and Overbid Procedures (such as date and time of the auction and minimum initial overbid amount) and contact information for the Debtor's counsel indicating that such counsel can provide a copy of the Notice and this Motion and Memorandum, Declarations, and Exhibits, which include the full, detailed Overbid Procedures.

7.      The efforts of the Debtor and the Broker to market and sell the Kearsarge Property resulted in the Debtor receiving a number of signed offers for the Kearsarge Property. The Debtor, with the assistance of the Broker, engaged in rounds of counteroffers to such offers. Ultimately, after considering the purchase prices offered by the prospective buyers and other terms of proposed purchase agreements, and based on consultation with its professionals, the Debtor accepted the offer from the Buyer and entered into the Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit "2."**

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this ____11th____ day of July 2018, at Torrance, California.


_____
W. DARROW FIEDLER

# EXHIBIT "1"

**Fidelity National Title Company**
3760 Kilroy Airport Way, Suite 110, Long Beach, CA 90806
Phone: (562) 951-5200

Issuing Policies of Fidelity National Title Insurance Company

ORDER NO.: **00178163-982-SC1-JH7**
LOAN NO.:

Title Officer:  Justine Hilgenberg
Phone: (562) 951-5200
Fax:
Email: justinesteam@fnf.com

Keller Williams Realty South Bay
23670 Hawthorne Blvd, Suite 100
Torrance, CA 90505

ATTN:
YOUR REF:     38303 Kearsarge Mill

| | |
|---|---|
| ATTN: | Darrow Fiedler |
| YOUR REF: | 38303 Kearsarge Mill |

PROPERTY:     **38303 Kearsarge Mill Road, Alta, CA**

## AMENDED **PRELIMINARY REPORT**

*In response to the application for a policy of title insurance referenced herein,* **Fidelity National Title Company** *hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read. They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(s) of title insurance to be issued hereunder will be policy(s) of Fidelity National Title Insurance Company, a Florida corporation.*

**Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.**

Countersigned by:

*Cindy Fried*

Authorized Signature

**Fidelity National Title Company**
3760 Kilroy Airport Way, Suite 110, Long Beach, CA 90806
Phone: (562) 951-5200

## AMENDED **PRELIMINARY REPORT**

---

**EFFECTIVE DATE:**               February 26, 2018 at 7:30 a.m., Amended: March 7, 2018, Amendment No. 1

**ORDER NO.: 00178163-982-SC1-JH7**

The form of policy or policies of title insurance contemplated by this report is:

**ALTA Extended Loan Policy (6-17-06)**

1.      THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

**A Fee as to Parcel(s) One; An Easement(s) more fully described below as to Parcel Two.**

2.      TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS VESTED IN:

**Darren L. Ladd and Danna Ladd, husband and wife as joint tenants, Subject to Instrument No. 2017-13031, as shown on schedule "B" herein**

3.      THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

**See Exhibit A attached hereto and made a part hereof.**

PRELIMINARY REPORT                                                Fidelity National Title Company
YOUR REFERENCE:  38303 Kearsarge Mill                  ORDER NO.:  00178163-982-SC1-JH7

# EXHIBIT A

## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF PLACER, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

THAT PORTION OF THE SOUTHWEST 1/4 OF SECTION 15, TOWNSHIP 16 NORTH, RANGE 11 EAST, MDB & M, INCLUDED WITHIN THE LAND SHOWN AND DESIGNATED AS PARCEL D ON PARCEL MAP NO. 72979, FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF PLACER COUNTY, CALIFORNIA ON APRIL 20, 1979, IN BOOK 14 OF PARCEL MAPS AT PAGE 78, PLACER COUNTY RECORDS.

PARCEL TWO:

A NON-EXCLUSIVE EASEMENT FOR ROAD, DRAINAGE AND PUBLIC UTILITY PURPOSES OVER, UNDER AND ACROSS A PORTION OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 16 NORTH, RANGE 11 EAST, MDB & M, INCLUDED WITHIN THE LAND SHOWN AND DESIGNATED AS AREA K OF PARCEL MAP NO. 72979, FILED IN THE OFFICE OF THE PLACER COUNTY RECORDER ON APRIL 20, 1979 IN BOOK 14 OF PARCEL MAPS, AT PAGE 78.

TOGETHER WITH AN EASEMENT FOR ROAD AND UTILITIES PURPOSES OVER A STRIP OF LAND 50 FEET IN WIDTH, THE CENTER LINE BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 15, THENCE FROM SAID POINT OF BEGINNING IN AN EASTERLY DIRECTION ALONG THE SOUTH LINE OF THE NORTHEAST ONE QUARTER (1/4) OF SAID SOUTHWEST ONE QUARTER (1/4) 700 FEET MORE OR LESS TO AN EXISTING ROAD TRAVERSING THE EAST HALF OF SAID SOUTHWEST QUARTER OF SECTION 15 IN A NORTHEASTERLY SOUTHWESTERLY DIRECTION.

ALSO TOGETHER WITH A NON-EXCLUSIVE EASEMENT FOR ROAD AND UTILITY PURPOSES AS DESCRIBED IN VOLUME 1939, PAGE 170, VOLUME 1944, PAGE 672, AND VOLUME 1916, PAGE 154, OFFICIAL RECORDS, PLACER COUNTY.

APN:  **062-520-016**

PRELIMINARY REPORT                                                                                          Fidelity National Title Company
YOUR REFERENCE:  38303 Kearsarge Mill                                                      ORDER NO.:  00178163-982-SC1-JH7

# EXCEPTIONS

**AT THE DATE HEREOF, ITEMS TO BE CONSIDERED AND EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

1.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2018-2019.

2.  Property taxes, including any personal property taxes and any assessments collected with taxes, are as follows:

    | | |
    |---|---|
    | Code Area: | 053017 |
    | Tax Identification No.: | 062-520-016-000 |
    | Fiscal Year: | 2017-2018 |
    | 1st Installment: | $1,908.57 Paid |
    | 2nd installment: | $1,908.57 Open |
    | Exemption: | $0.00 |
    | Land: | $102,431.00 |
    | Improvements: | $259,664.00 |
    | Personal Property: | $0.00 |

3.  Supplemental assessment for 2017-2018:

    | | |
    |---|---|
    | 1st Installment | $245.02, Delinquent Plus Penalty $24.50 |
    | Must be Paid By: | December 10, 2017 |
    | 2nd Installment | $245.02, Open |
    | Must be Paid By: | April 10, 2018 |

4.  Supplemental assessment for 2017-2018:

    | | |
    |---|---|
    | 1st Installment | $707.13, Delinquent Plus Penalty $ 70.71 |
    | Must be Paid By: | December 10, 2017 |
    | 2nd Installment | $707.13, Open |
    | Must be Paid By: | April 10, 2018 |

5.  The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4,  respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

    Note: If said supplementals (if any) are not posted prior to the date of closing, this company assumes no liability for payment thereof.

6.  Water rights, claims or title to water, whether or not disclosed by the public records.

7.  Easement(s) for the purpose(s) shown below and rights incidental thereto as granted in a document:

    | | |
    |---|---|
    | Granted To: | Southern Pacific Pipelines, Inc |
    | Purpose: | Pipelines |
    | Recording Date: | November 23, 1956 |
    | Recording No: | Book 719, Page 202, Official Records |
    | Affects: | Said land |

    The exact location and extent of said easement is not disclosed of record.

8.  Easement(s) for the purpose(s) shown below and rights incidental thereto as granted in a document:

CLTA Preliminary Report Form – Modified (11/17/06)                                                                                          Page 4

## EXCEPTIONS
### (Continued)

| | |
|---|---|
| Granted To: | J.G. Walsh, et al |
| Purpose: | Road and utilities |
| Recording Date: | February 27, 1978 |
| Recording No: | Book 1944, Page 672, Official Records |
| Affects: | Southeasterly portion |

9.  Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

| | |
|---|---|
| Recording Date: | March 17, 1978 |
| Recording No: | Book 1952, Page 317, Official Records |

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

10.  Easement(s) for the purpose(s) shown below and rights incidental thereto as granted in a document:

| | |
|---|---|
| Granted To: | Western Planning and Research |
| Purpose: | Road and utilities |
| Recording Date: | March 2, 1979 |
| Recording No: | Book 2091, Page 373, Official Records |
| Affects: | Northerly 25 feet |

11.  Covenants, conditions and restrictions but omitting any covenants or restrictions, if any, including but not limited to those based upon race, color, religion, sex, sexual orientation, familial status, marital status, disability, handicap, national origin, citizenship, immigration status, primary language, ancestry, source of income, gender, gender identity, gender expression, medical condition or genetic information, as set forth in applicable state or federal laws, except to the extent that said covenant or restriction is permitted by applicable law, as set forth in the document

| | |
|---|---|
| Recording Date: | April 20, 1979 |
| Recording No: | Book 2110, Page 540, Official Records |

Said covenants, conditions and restrictions provide that a violation thereof shall not defeat the lien of any mortgage or deed of trust made in good faith and for value.

12.  A Road Maintenance Agreement, upon the terms, covenants and provisions contained therein,

| | |
|---|---|
| Recording Date: | April 20, 1979 |
| Recording No.: | Book 2110, Page 542, Official Records |

13.  Easement(s) for the purpose(s) shown below and rights incidental thereto as granted in a document:

| | |
|---|---|
| Granted To: | Alice M. Baxter |
| Purpose: | Road and utilities |
| Recording Date: | November 14, 1979 |
| Recording No: | Book 2195, Page 230, Official Records |
| Affects: | Southeasterly portion |

14.  A deed of trust to secure an indebtedness in  the amount shown below,

PRELIMINARY REPORT                                                          Fidelity National Title Company
YOUR REFERENCE:  38303 Kearsarge Mill                      ORDER NO.:  00178163-982-SC1-JH7

## EXCEPTIONS
### (Continued)

| | |
|---|---|
| Amount: | $235,500.00 |
| Dated: | October 23, 2000 |
| Trustor/Grantor: | Darren L. Ladd and Danna Ladd, husband and wife as joint tenants |
| Trustee: | Sierra Valley Title Company |
| Beneficiary: | Capitol Valley Bank |
| Loan No.: | 190514301 |
| Recording Date: | October 27, 2000 |
| Recording No: | 2000-0081186, Official Records |

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

| | |
|---|---|
| Trustee: | UMPQUA Bank |
| Recording Date: | November 14, 2012 |
| Recording No.: | 2012-0107726, Official Records |

The effect of a full reconveyance recorded November 14, 2012 at 2012-0107726, Official Records, which purports to reconvey the above-mentioned Deed of Trust.

No statement is made hereto as to the effect or validity of said reconveyance.

The requirement that this Company be furnished with confirmation from the lender that the Deed of Trust has been released prior to issuance of a policy of title insurance.

15.    A document entitled "Partial Assignment of Easement and Right-of-Way"

| | |
|---|---|
| Recording Date: | December 9, 2002 |
| Recording No.: | 2002-0156719, Official Records |

16.    A deed of trust to secure an indebtedness in  the amount shown below,

| | |
|---|---|
| Amount: | $356,200.00 |
| Dated: | December 7, 2006 |
| Trustor/Grantor: | Darren L. Ladd and Danna Ladd, husband and wife as joint tenants |
| Trustee: | Jackie Miller |
| Beneficiary: | Suntrust Mortgage, Inc. |
| Loan No.: | 0144907458 |
| Recording Date: | December 14, 2006 |
| Recording No: | 2006-0133761, Official Records |

By various assignments, the beneficial interest thereunder is now held of record in:

| | |
|---|---|
| Assignee: | US Bank Trust National Association, as Trustee of the PRP II Pals Investments Trust |
| Loan No.: | 266 |
| Recording Date: | August 9, 2016 |
| Recording No.: | 2016-0065339, Official Records |

17.    A deed of trust to secure an indebtedness in  the amount shown below,

PRELIMINARY REPORT                                                                    Fidelity National Title Company
YOUR REFERENCE:  38303 Kearsarge Mill                                        ORDER NO.:  00178163-982-SC1-JH7

## EXCEPTIONS
### (Continued)

Amount:                    $30,000.00
Dated:                     July 6, 2007
Trustor/Grantor:           Darren L. Ladd and Danna Ladd, husband and wife as joint tenants
Trustee:                   Beneficial California Inc.
Beneficiary:               Beneficial California Inc, a corporation
Loan No.:                  None Shown
Recording Date:            July 10, 2007
Recording No:              2007-0068472, Official Records

The Deed of Trust set forth above is purported to be a "Credit Line" Deed of Trust. Under California Civil Code Section 2943.1 it is a requirement that the Trustor/Grantor of said Deed of Trust either immediately provide the beneficiary with the "Borrower's instruction to Suspend and Close Equity Line of Credit" or provide a satisfactory subordination of this Deed of Trust to the proposed Deed of Trust to be recorded at closing.

If the above credit line is being paid off, this Company will require that Escrow obtain written confirmation from the current Beneficiary that the account has been frozen prior to recording. Failure to do so will result in this Company holding funds at the close of Escrow until such confirmation is obtained from the Beneficiary.

PRELIMINARY REPORT                                                      Fidelity National Title Company
YOUR REFERENCE:  38303 Kearsarge Mill                                   ORDER NO.:  00178163-982-SC1-JH7

## EXCEPTIONS
### (Continued)

18.    Notice of delinquent assessments and lien payable to the Owners' Association pursuant to the declaration herein.

        Name of Declaration:
        Amount:                    $2,216.66
        Owners Association:        Kearsarge Mill Road Association
        Recording Date:            April 26, 2016
        Recording No:              2016-30745, Official Records

19.    A Deed:

        From:                      Darren L. Ladd and Danna Ladd, husband and wife as joint tenants
        To:                        Grand View Financial LLC
        Dated:                     February 22, 2017
        Recording Date:            February 23, 2017
        Recording No.:             2017-0013031, Official Records

        For insurance purposes, the Company is not willing to divest the interest of the following party(s):

        Party(s):                  Darren L. Ladd and Danna Ladd

        In order to complete this report the Company requires the following:

        Info Requested:            Completed Statement of Information and an Affidavit for an Uninsured Deed, (Signed
                           and Notarized by a Notary Public different from the one who notarized the deed shown
                           above)
        Party:                     Darren L. Ladd and Danna Ladd

        The Company reserves the right to make additional requirements or add additional items or exceptions after review
        of the requested documentation.

20.    If the Land is located within the area affected by a Geographic Targeting Order issued by FinCEN (California
        counties of Los Angeles, San Diego, San Francisco, Santa Clara and San Mateo), the buyer is a legal entity, and the
        sales price is $2,000,000.00 or greater, the Company must be supplied with a completed ALTA Information
        Collection Form ("ICF") and the IRS FinCEN 8300 Form, if necessary (attached hereto), completed and executed by
        the buyer, prior to the close of escrow.

**PLEASE REFER TO THE "INFORMATIONAL NOTES" AND "REQUIREMENTS" SECTIONS WHICH
FOLLOW FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION.**

---

### END OF EXCEPTIONS

---

# REQUIREMENTS SECTION

1.     In order to complete this report, the Company requires a Statement of Information to be completed by the following party(s),

   Party(s):                    All Parties

The Company reserves the right to add additional items or make further requirements after review of the requested Statement of Information.

NOTE: The Statement of Information is necessary to complete the search and examination of title under this order. Any title search includes matters that are indexed by name only, and having a completed Statement of Information assists the Company in the elimination of certain matters which appear to involve the parties but in fact affect another party with the same or similar name. Be assured that the Statement of Information is essential and will be kept strictly confidential to this file.

2.     The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:  Grand View Financial, LLC

a) A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member

b) If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps

c) If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member

d) A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e) If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

---

## END OF REQUIREMENTS

---

# INFORMATIONAL NOTES SECTION

1.      Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

2.      None of the items shown in this report will cause the Company to decline to attach CLTA Endorsement Form 100 to an Extended Coverage Loan Policy, when issued.

3.      Note: The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land a Single Family Dwelling, known as 38303 Kearsarge Mill Road, Alta, California to an Extended Coverage Loan Policy.

4.      Note: The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration provision. Arbitrable matters may include, but are not limited to any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance Coverage.

5.      Note:  The charge for a policy of title insurance, when issued through this application for title insurance, will be based on the Short Term Rate.

6.      The only deed(s) affecting said land which recorded within twenty-four (24) months of the date of this report, is (are) as follows:

        Grantor:                Darren L. Ladd and Danna Ladd, husband and wife as joint tenants
        Grantee:                Grand View Financial, LLC
        Recording Date:         February 23, 2017
        Recording No.:          2017-13031, Official Records

7.      The Note shown below, which recites: "California Revenue and taxation Code Section 18668, effective January 1, 1991, requires that the buyer in all sales of California Real Estate, wherein the Seller shows an Out of State Address, withhold 3-1/3% of the total sales price as California State Income Tax, subject to the various provisions of the law as therein contained."

        is hereby deleted and replaced with the following:

        Cailfornia Revenue and Taxation Code Section 18662, effective January 1, 1994 and by amendment effective January 1, 2003, provides that the buyer in all sales of California Real Estate may be required to withhold 3 and 1/3% of the total sales price as California State Income Tax, subject to the various provisions of the law as therein contained.

8.      The Company has been informed that the policy will have a liability of $356,200.00, and that "Lenders: To Follow" will be named insured.

9.      Note: The map attached, if any, may or may not be a survey of the land depicted hereon. Fidelity National Title Company, expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

10.     Unless this company is in receipt of WRITTEN instructions authorizing a particular policy, Fidelity Title will AUTOMATICALLY issue the American Land Title Association Homeowner's Policy (02/03/10) for all qualifying residential 1-4 properties/transactions to insure the buyer at the close of escrow.

## INFORMATIONAL NOTES
### (Continued)

11.   If a county recorder, title insurance company, escrow company, real estate broker, real estate agent or association provides a copy of a declaration, governing document or deed to any person, California law requires that the document provided shall include a statement regarding any unlawful restrictions. Said statement is to be in at least 14-point bold face type and may be stamped on the first page of any document provided or included as a cover page attached to the requested document. Should a party to this transaction request a copy of any document reported herein that fits this category, the statement is to be included in the manner described.

12.   Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third party service. If the above requirements cannot be met, please call the Company at the number provided in this report

13.   Amended Civil Code Section 2941, which becomes effective on January 1, 2002, sets the fee for the processing and recordation of the reconveyance of each Deed of Trust being paid off through this transaction at $45.00. The reconveyance fee must be clearly set forth in the Beneficiary's Payoff Demand Statement ("Demand"). In addition, an assignment or authorized release of that fee, from the Beneficiary to the Trustee of record, must be included. An example of the required language is as follows:

The Beneficiary identified above hereby assigns, releases or transfers to the Trustee of record, the sum of $45.00, included herein as 'Reconveyance Fees', for the processing and recordation of the Reconveyance of the Deed of Trust securing the indebtedness covered hereby, and the escrow company or title company processing this pay-off is authorized to deduct the Reconveyance Fee from this Demand and forward said fee to the Trustee of record or the successor Trustee under the Trust Deed to be paid off in full.

In the event that the reconveyance fee and the assignment, release or transfer are not included within the demand statement, then Fidelity National Title Insurance Company and its Underwritten Agent may decline to process the reconveyance and will be forced to return all documentation directly to the Beneficiary for compliance with the requirements of the revised statute.

14.   Note: Part of the RESPA Rule to simplify and Improve the Process of Obtaining Mortgages and Reduce Consumer Settlement Costs requires the settlement agent to disclose the agent and underwriter split of title premiums, including endorsements as follows:

Line 1107 is used to record the amount of the total title insurance premium, including endorsements, that is retained by the title agent. Fidelity National Title Company retains 88% of the total premium and endorsements.

Line 1108 used to record the amount of the total title insurance premium, including endorsements, that is retained by the title underwriter. Fidelity National Title Insurance Company retains 12% of the total premium and endorsements.

---

### END OF INFORMATIONAL NOTES

---

Justine Hilgenberg/jr

# FIDELITY NATIONAL FINANCIAL

## PRIVACY NOTICE

At Fidelity National Financial, Inc., we respect and believe it is important to protect the privacy of consumers and our customers. This Privacy Notice explains how we collect, use, and protect any information that we collect from you, when and to whom we disclose such information, and the choices you have about the use of that information. A summary of the Privacy Notice is below, and we encourage you to review the entirety of the Privacy Notice following this summary. You can opt-out of certain disclosures by following our opt-out procedure set forth at the end of this Privacy Notice.

| | |
|---|---|
| **Types of Information Collected.** You may provide us with certain personal information about you, like your contact information, address demographic information, social security number (SSN), driver's license, passport, other government ID numbers and/or financial information. We may also receive browsing information from your Internet browser, computer and/or mobile device if you visit or use our websites or applications. | **How Information is Collected.** We may collect personal information from you via applications, forms, and correspondence we receive from you and others related to our transactions with you. When you visit our websites from your computer or mobile device, we automatically collect and store certain information available to us through your Internet browser or computer equipment to optimize your website experience. |
| **Use of Collected Information.** We request and use your personal information to provide products and services to you, to improve our products and services, and to communicate with you about these products and services. We may also share your contact information with our affiliates for marketing purposes. | **When Information Is Disclosed.** We may disclose your information to our affiliates and/or nonaffiliated parties providing services for you or us, to law enforcement agencies or governmental authorities, as required by law, and to parties whose interest in title must be determined. |
| **Choices With Your Information.** Your decision to submit information to us is entirely up to you. You can opt-out of certain disclosure or use of your information or choose to not provide any personal information to us. | **Information From Children.** We do not knowingly collect information from children who are under the age of 13, and our website is not intended to attract children. |
| **Privacy Outside the Website.** We are not responsible for the privacy practices of third parties, even if our website links to those parties' websites. | **International Users.** By providing us with your information, you consent to its transfer, processing and storage outside of your country of residence, as well as the fact that we will handle such information consistent with this Privacy Notice. |
| **The California Online Privacy Protection Act.** Some FNF companies provide services to mortgage loan servicers and, in some cases, their websites collect information on behalf of mortgage loan servicers. The mortgage loan servicer is responsible for taking action or making changes to any consumer information submitted through those websites. | |
| **Your Consent To This Privacy Notice.** By submitting information to us or by using our website, you are accepting and agreeing to the terms of this Privacy Notice. | **Access and Correction; Contact Us.** If you desire to contact us regarding this notice or your information, please contact us at privacy@fnf.com or as directed at the end of this Privacy Notice. |

# FIDELITY NATIONAL FINANCIAL, INC.
## PRIVACY NOTICE

Fidelity National Financial, Inc. and its majority-owned subsidiary companies providing title insurance, real estate- and loan-related services (collectively, "FNF", "our" or "we") respect and are committed to protecting your privacy. We will take reasonable steps to ensure that your Personal Information and Browsing Information will only be used in compliance with this Privacy Notice and applicable laws. This Privacy Notice is only in effect for Personal Information and Browsing Information collected and/or owned by or on behalf of FNF, including Personal Information and Browsing Information collected through any FNF website, online service or application (collectively, the "Website").

**Types of Information Collected**
We may collect two types of information from you: Personal Information and Browsing Information.

Personal Information. FNF may collect the following categories of Personal Information:
- contact information (e.g., name, address, phone number, email address);
- demographic information (e.g., date of birth, gender, marital status);
- social security number (SSN), driver's license, passport, and other government ID numbers;
- financial account information; and
- other personal information needed from you to provide title insurance, real estate- and loan-related services to you.

Browsing Information. FNF may collect the following categories of Browsing Information:
- Internet Protocol (or IP) address or device ID/UDID, protocol and sequence information;
- browser language and type;
- domain name system requests;
- browsing history, such as time spent at a domain, time and date of your visit and number of clicks;
- http headers, application client and server banners; and
- operating system and fingerprinting data.

**How Information is Collected**
In the course of our business, we may collect *Personal Information* about you from the following sources:
- applications or other forms we receive from you or your authorized representative;
- the correspondence you and others send to us;
- information we receive through the Website;
- information about your transactions with, or services performed by, us, our affiliates or nonaffiliated third parties; and
- information from consumer or other reporting agencies and public records maintained by governmental entities that we obtain directly from those entities, our affiliates or others.

If you visit or use our Website, we may collect *Browsing Information* from you as follows:
- Browser Log Files. Our servers automatically log each visitor to the Website and collect and record certain browsing information about each visitor. The Browsing Information includes generic information and reveals nothing personal about the user.
- Cookies. When you visit our Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. When you visit a website again, the cookie allows the website to recognize your computer. Cookies may store user preferences and other information. You can choose whether or not to accept cookies by changing your Internet browser settings, which may impair or limit some functionality of the Website.

**Use of Collected Information**
Information collected by FNF is used for three main purposes:
- To provide products and services to you or any affiliate or third party who is obtaining services on your behalf or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you and to inform you about our, our affiliates' and third parties' products and services, jointly or independently.

**When Information Is Disclosed**
We may provide your Personal Information (excluding information we receive from consumer or other credit reporting agencies) and Browsing Information to various individuals and companies, as permitted by law, without obtaining your prior authorization. Such laws do not allow consumers to restrict these disclosures. Please see the section "Choices With Your Personal Information" to learn how to limit the discretionary disclosure of your Personal Information and Browsing Information.

Disclosures of your Personal Information may be made to the following categories of affiliates and nonaffiliated third parties:
- to third parties to provide you with services you have requested, and to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to our affiliate financial service providers for their use to market their products or services to you;
- to nonaffiliated third party service providers who provide or perform services on our behalf and use the disclosed information only in connection with such services;
- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to market financial products or services to you;
- to law enforcement or other governmental authority in connection with an investigation, or civil or criminal subpoena or court order;

- to lenders, lien holders, judgment creditors, or other parties claiming an interest in title whose claim or interest must be determined, settled, paid, or released prior to closing; and
- other third parties for whom you have given us written authorization to disclose your Personal Information.

We may disclose Personal Information and/or Browsing Information when required by law or in the good-faith belief that such disclosure is necessary to:

- comply with a legal process or applicable laws;
- enforce this Privacy Notice;
- investigate or respond to claims that any material, document, image, graphic, logo, design, audio, video or any other information provided by you violates the rights of a third party; or
- protect the rights, property or personal safety of FNF, its users or the public.

We maintain reasonable safeguards to keep your Personal Information secure. When we provide Personal Information to our affiliates or third party service providers as discussed in this Privacy Notice, we expect that these parties process such information in compliance with our Privacy Notice or in a manner that is in compliance with applicable privacy laws. The use of your information by a business partner may be subject to that party's own Privacy Notice. Unless permitted by law, we do not disclose information we collect from consumer or credit reporting agencies with our affiliates or others without your consent.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of our bankruptcy, reorganization, insolvency, receivership or an assignment for the benefit of creditors. You expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings. We cannot and will not be responsible for any breach of security by a third party or for any actions of any third party that receives any of the information that is disclosed to us.

**Choices With Your Information**
Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you. The uses of your Personal Information and/or Browsing Information that, by law, you cannot limit, include:

- for our everyday business purposes – to process your transactions, maintain your account(s), to respond to law
- enforcement or other governmental authority in connection with an investigation, or civil or criminal subpoenas or court
- orders, or report to credit bureaus;
- for our own marketing purposes;
- for joint marketing with financial companies; and
- for our affiliates' everyday business purposes – information about your transactions and experiences.

You may choose to prevent FNF from disclosing or using your Personal Information and/or Browsing Information under the following circumstances ("opt-out"):

- for our affiliates' everyday business purposes – information about your creditworthiness; and
- for our affiliates to market to you.

To the extent permitted above, you may opt-out of disclosure or use of your Personal Information and Browsing Information by notifying us by one of the methods at the end of this Privacy Notice. We do not share your personal information with non-affiliates for their direct marketing purposes.

For California Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties, except as permitted by California law. Currently, our policy is that we do not recognize "do not track" requests from Internet browsers and similar devices.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties, except as permitted by Vermont law, such as to process your transactions or to maintain your account. In addition, we will not share information about your creditworthiness with our affiliates except with your authorization. For joint marketing in Vermont, we will only disclose your name, contact information and information about your transactions.

**Information From Children**
The Website is meant for adults and is not intended or designed to attract children under the age of thirteen (13).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian. By using the Website, you affirm that you are over the age of 13 and will abide by the terms of this Privacy Notice.

**Privacy Outside the Website**
The Website may contain links to other websites. FNF is not and cannot be responsible for the privacy practices or the content of any of those other websites.

**International Users**

FNF's headquarters is located within the United States. If you reside outside the United States or are a citizen of the European Union, please note that we may transfer your Personal Information and/or Browsing Information outside of your country of residence or the European Union for any of the purposes described in this Privacy Notice. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection and transfer of such information in accordance with this Privacy Notice.

**The California Online Privacy Protection Act**

For some FNF websites, such as the Customer CareNet ("CCN"), FNF is acting as a third party service provider to a mortgage loan servicer. In those instances, we may collect certain information on behalf of that mortgage loan servicer via the website. The information which we may collect on behalf of the mortgage loan servicer is as follows:

- first and last name;
- property address;
- user name and password;
- loan number;
- social security number - masked upon entry;
- email address;
- three security questions and answers; and
- IP address.

The information you submit through the website is then transferred to your mortgage loan servicer by way of CCN. **The mortgage loan servicer is responsible for taking action or making changes to any consumer information submitted through this website. For example, if you believe that your payment or user information is incorrect, you must contact your mortgage loan servicer.**

CCN does not share consumer information with third parties, other than (1) those with which the mortgage loan servicer has contracted to interface with the CCN application, or (2) law enforcement or other governmental authority in connection with an investigation, or civil or criminal subpoenas or court orders. All sections of this Privacy Notice apply to your interaction with CCN, except for the sections titled "Choices with Your Information" and "Access and Correction." If you have questions regarding the choices you have with regard to your personal information or how to access or correct your personal information, you should contact your mortgage loan servicer.

**Your Consent To This Privacy Notice**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information by us in compliance with this Privacy Notice. Amendments to the Privacy Notice will be posted on the Website. Each time you provide information to us, or we receive information about you, following any amendment of this Privacy Notice will signify your assent to and acceptance of its revised terms for all previously collected information and information collected from you in the future. We may use comments, information or feedback that you submit to us in any manner that we may choose without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to access or correct your Personal Information, or want to opt-out of information sharing with our affiliates for their marketing purposes, please send your requests to privacy@fnf.com or by mail or phone to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer
(888) 934-3354

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment. Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the field rate. As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative. These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for each discount. These discounts only apply to transaction involving services rendered by the FNF Family of Companies. This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

**FNF Underwritten Title Company**
FNTC - Fidelity National Title Company
FNTCCA – Fidelity National Title Company of California

**FNF Underwriter**
FNTIC - Fidelity National Title Insurance Company

**Available Discounts**
**CREDIT FOR PRELIMINARY REPORTS AND/OR COMMITMENTS ON SUBSEQUENT POLICIES (FNTIC)**
Where no major change in the title has occurred since the issuance of the original report or commitment, the order may be reopened within 12 months and all or a portion of the charge previously paid for the report or commitment may be credited on a subsequent policy charge within the following time period from the date of the report.

**DISASTER LOANS (FNTIC)**
The charge for a lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within 24 months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be 50% of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be 40% to 50% of the appropriate title insurance rate, depending on the type of coverage selected.

**ATTACHMENT ONE**

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE POLICY – 1990**

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c)  resulting in no loss or damage to the insured claimant;
   (d)  attaching or created subsequent to Date of Policy; or
   (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims;  (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof;  (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material not shown by the public records.

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**

### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a.  building;
   b.  zoning;
   c.  land use;
   d.  improvements on the Land;
   e.  land division; and
   f.  environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3. The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.

4. Risks:
   a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;

c.   that result in no loss to You; or

d.   that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right:

a.   to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and

b.   in streets, alleys, or waterways that touch the Land.

This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  |  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|---|
| Covered Risk 16: | 1.00% | % of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% | % of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

### 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i)  the occupancy, use, or enjoyment of the Land;

(ii)  the character, dimensions, or location of any improvement erected on the Land;

(iii)  the subdivision of land; or

(iv)  environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

(b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters

(a)  created, suffered, assumed, or agreed to by the Insured Claimant;

(b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c)  resulting in no loss or damage to the Insured Claimant;

(d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or

(e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

(a)  a fraudulent conveyance or fraudulent transfer, or

(b)  a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

(Except as provided in Schedule B - Part II,( t(or T)his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

Attachment One (6-5-14) CA & NV

**(PART I**

(The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the Public Records.

**PART II**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:)

**2006 ALTA OWNER'S POLICY (06-17-06)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a)  Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b)  Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.  Defects, liens, encumbrances, adverse claims, or other matters
    (a)  created, suffered, assumed, or agreed to by the Insured Claimant;
    (b)  not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c)  resulting in no loss or damage to the Insured Claimant;
    (d)  attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e)  resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a)  a fraudulent conveyance or fraudulent transfer; or
    (b)  a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

(The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.  Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.  Any lien or right to a lien for services, labor or material not shown by the Public Records.

7.  (Variable exceptions such as taxes, easements, CC&R's, etc. shown here.)

Attachment One (6-5-14) CA & NV

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (12-02-13)**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i)   the occupancy, use, or enjoyment of the Land;
    (ii)  the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv)  environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.
10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

Attachment One (6-5-14) CA & NV



Fidelity National Title Company
This map/plat is being furnished as an aid in locating the herein described Land in relation
to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted.
Except to the extent a policy of title insurance is expressly modified by endorsement, if any,
the Company does not insure dimensions, distances, location of easements, acreage or
other matters shown thereon.

STATEMENT OF INFORMATION

CONFIDENTIAL INFORMATION STATEMENT TO BE USED IN CONNECTION WITH ORDER NO: 00178163-982-JH7
*COMPLETION OF THIS FORM WILL EXPEDITE YOUR ORDER AND WILL HELP PROTECT YOU.*

**THE STREET ADDRESS of the property in this transaction is:**
IF NONE LEAVE BLANK

ADDRESS:                                                              CITY:

IMPROVEMENTS:    ☐ SINGLE RESIDENCE    ☐ MULTIPLE RESIDENCE    ☐ COMMERCIAL
OCCUPIED BY:        ☐ OWNER                    ☐ LESSEE                          ☐ TENANTS
ANY PORTION OF NEW LOAN FUNDS TO BE USED FOR CONSTRUCTION:    ☐ YES    ☐ NO

| **NAME** | **SPOUSES NAME** |
|---|---|
| FIRST          MIDDLE          LAST | FIRST          MIDDLE          LAST |
| BIRTHPLACE                    BIRTH DATE | BIRTHPLACE                    BIRTH DATE |
| I HAVE LIVED IN CALIFORNIA SINCE     SOCIAL SECURITY NUMBER | I HAVE LIVED IN CALIFORNIA SINCE     SOCIAL SECURITY NUMBER |
| DRIVER'S LICENSE NO. | DRIVER'S LICENSE NO. |
| WIFE'S MAIDEN NAME: | |

WE WERE MARRIED ON                                              AT

## RESIDENCE(S) FOR LAST 10 YEARS

| NUMBER AND STREET | CITY | FROM | TO |
|---|---|---|---|
| NUMBER AND STREET | CITY | FROM | TO |
| NUMBER AND STREET | CITY | FROM | TO |
| NUMBER AND STREET | CITY | FROM | TO |

## OCCUPATION(S) FOR LAST 10 YEARS

**HUSBAND**

| PRESENT OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
|---|---|---|---|
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |

**WIFE**

| PRESENT OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
|---|---|---|---|
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |
| PRIOR OCCUPATION | FIRM NAME | ADDRESS | NO. OF YEARS |

**FORMER MARRIAGES:** IF NO FORMER MARRIAGES, WRITE "NONE":

NAME OF FORMER SPOUSE

IF DECEASED:  DATE                                              WHERE

**CURRENT LOAN ON PROPERTY**

PAYMENTS ARE BEING MADE TO:                                    2.

1.                                                              3.

HOMEOWNERS ASSOCIATION                                    NUMBER:

DATE _____   SIGNATURE _____

              HOME PHONE _____     BUSINESS PHONE _____

MISC0008 (Rev. 09/15/2011)

**Fidelity National Title Company**
3760 Kilroy Airport Way, Suite 110, Long Beach, CA 90806
Phone:  (562) 951-5200    ●    Fax:

## CREDIT LINE / EQUITY LINE OF CREDIT CLOSURE REQUEST

Date:  _____

To:  _____

_____

_____

_____

**Attention:**  Payoff Dept.
**Reference:**  Account/Loan # _____
**Property Address:**        38303 Kearsarge Mill Road, Alta, CA 95701


To Whom It May Concern:

Please accept this letter as a request to close/freeze the above-referenced credit line or equity line of credit as of this date.

I/We agree not to request any advances on this account on or after the date of this letter.

You will be receiving payment in full from the proceeds of our escrow transaction. Upon receipt of payoff, please send your Reconveyance or Release of Lien to:

**Fidelity National Title Company**
3760 Kilroy Airport Way, Suite 110
Long Beach, CA 90806
Attn:  Justine Hilgenberg
Ref:  00178163-982-JH7

Sincerely,

_____        _____

_____        _____

_____        _____

(All borrowers must sign)

# EXHIBIT "2"

## Counteroffer re Purchase and Sale of:
## 38303 Kearsarge Mill Rd., Alta, CA 95701

This is a counteroffer ("Counteroffer") to the June 15, 2018, "CA Residential Purchase Agreement and Joint Escrow Instructions" (the "Buyer's Offer") from Parker James Geisinger, Katelyn Joy Geisinger (collectively, "Buyer") regarding the purchase of the real property commonly known as 38303 Kearsarge Mill Rd., Alta, CA 95701, APN: 062-520-016 ("Property"), by the Buyer from Grand View Financial, LLC ("Seller" or "Debtor," and together with Buyer the "Parties"), the Chapter 11 debtor and debtor in possession, in bankruptcy case number 2:17-bk-20125-RK pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").

When fully-executed below, this Counteroffer will constitute conclusive evidence of the contract for the sale and purchase of the Property (the "Sale") and the Parties agreement for the Sale, subject to overbid and approval by the Bankruptcy Court in the Debtor's bankruptcy case and further or more complete documentation in Seller's discretion. **This Counteroffer Supersedes the Buyer's Offer.** Seller may elect to deem· this Counteroffer the definitive agreement between the Parties regarding the Sale.

1. Purchase Price: The purchase price for the Property shall be $375,000; all cash (the "Purchase Price").

2. Initial Deposit: Within two (2) business days following Buyer's execution of this Counteroffer, Buyer shall deliver to escrow, together with an executed copy of this Counteroffer, the sum of 3% of the Purchase Price, which amounts to $11,250 and shall be applied toward the Purchase Price (the "Deposit"), as follows:

    Better Escrow Service, Alitta Mitchell, Escrow Officer
    3115 W. Olive Av., Burbank, CA 91505-4545
    (818) 381-4714; alitta@betterescrowservice.com

3. Due Diligence Period: Buyer acknowledges that he/she/it is familiar with the Property. At Buyer's sole expense, Buyer shall have until 1:00 p.m. PDT, on July 2, 2018, to obtain all investigations, appraisals and tests, and to complete any and all due diligence which the Buyer desires (the "Due Diligence Deadline"). By no later than the Due Diligence Deadline, Buyer may advise Seller, in writing, of his/her/its election to cancel the Sale, in which case Buyer shall receive a full refund of the Deposit (the "Notice to Cancel"). Absent Buyer's submission of a Notice to Cancel in accordance with this paragraph 3, the Sale shall be without any further contingencies or due diligence requirements of the Buyer.

1

**Without limiting the generality of the foregoing, Buyer's silence shall be deemed an acceptance and affirmative election to proceed with the Sale without any further contingencies or due diligence requirements.**

4.    Bankruptcy Court Approval:  The Sale is expressly subject to Bankruptcy Court approval in the Debtor's bankruptcy case.  As soon as reasonably practical following expiration of the Due Diligence Deadline without Buyer's submission of a Notice to Cancel, Seller shall file a motion to approve the Sale with the Bankruptcy Court pursuant to section 363 of the United States Bankruptcy Code and related overbid procedures (the "Approval Motion"). As part of such motion, Seller shall request a finding of Buyer's "good faith" in accordance with section 363(m) of the United States Bankruptcy Code.

5.    Overbid: The Sale is subject to notice to creditors and other parties in interest and shall be subject to higher and better bids through and including the hearing on the Approval Motion, pursuant to sale and overbid procedures determined in Seller's sole discretion and subject to Bankruptcy Court approval.  Break-up Fee provision:  Buyer to receive ($5000) if not the successful bidder; Initial overbid will be $385,000 and thereafter in $1,000 increments.

6.    Tender of Balance of Purchase Price/Closing:  The Sale shall close, with Buyer tendering the full Purchase Price, not more than fifteen (15) calendar days after the entry of an order of the Bankruptcy Court authorizing the Sale.

7.    Property Sold "As is" "Where is":  Buyer acknowledges that Seller is a debtor in possession administering its bankruptcy estate.  Seller and or Seller's agents have not, and will not, inspect the Property or determine its condition, fitness or use for any particular purpose, nor will any of them provide any written disclosures, guarantees or warranties of any kind. Seller and Seller's agents are exempt from complying with the requirements of Article 1.5 of the California Civil Code Sections 1102-1102.17 relating to disclosures upon transfer of real property.
**The sale shall be "as-is" and "where is" with no warranty or recourse whatsoever.**  If any state or local ordinance laws require that the Property be brought into compliance, Buyer, at his/her/its sole expense, shall comply with and pay for any such requirements.

8.    Transfer of Property: Transfer of the Property by Seller shall be by Grant Deed or Quitclaim Deed.  Seller shall convey and Buyer shall accept the marketable title to the Property that will be insured by Fidelity National Title Company, without material exception, subject only to the terms of this Counteroffer and any further documentation of the Sale consistent with this Counteroffer.

9.    <u>Liens, Claims, Encumbrances and Interests</u>:  The Sale shall be free and of such liens, claims, encumbrances, and interests, with such liens, claims, encumbrances, and interests attaching to the net proceeds of the Sale with the same extent, validity, and priority of such liens, claims, encumbrances, and interests prior to the Sale.

10.    <u>Assessments, Taxes and Escrow fees</u>:   The following assessments, taxes and other costs shall be allocated as follows: (a) all allowable assessments and real property taxes shall be prorated through the closing date of the Sale to the applicable accounts of Seller and Buyer, such that the amounts applicable to the account of Buyer shall not be deducted from the Purchase Price;  (b) escrow fees shall be split equally between Buyer and Seller (50/50), such that the amounts allocable to Buyer shall not be deducted from the Purchase Price; (c) Seller shall pay real property transfer tax (County and State only) and the costs of a standard issue title insurance policy, such that these taxes and costs shall not be deducted from the Purchase Price; and (d) City transfer tax shall be split equally between Buyer and Seller (50/50), such that the amount allocable to Buyer shall not be deducted from the Purchase Price. **All other costs are at Buyer's sole expense and are not to be deducted from the Purchase Price.**

11.    <u>Brokers and Commissions</u>:  Buyer is represented by KW El Dorado Hills, CalBRE #02051181 ("Buyer Broker") and the Seller is represented by Keller Williams Realty South Bay & KW El Dorado Hills, CalBRE #01854035 ("KWR & KWEDH").  Subject to Bankruptcy Court approval, Seller shall pay commission as follows, through escrow: six percent (6%) of the Purchase Price total: 2.5% to Buyer Broker and 1.75% to KWR & 1.75 KWEDH.  No commission shall be due and payable except from the cash proceeds of an actual sale of the Property to the Buyer and upon closing of such sale.

12.    <u>Seller Right to Terminate</u>:   Seller may decline, at its option and sole discretion, to consummate the Sale for any reason, including without limitation: (a) the dismissal or closure of the Debtor's bankruptcy case; (b) the conversion of the debtor's Chapter 11 bankruptcy case to any other chapter under the Bankruptcy Code; (c) the inability to subordinate any liens on the Property to the expenses of administration; (d) the inability to obtain approval of the Sale by the Bankruptcy Court; or (e) the inability to sell the Property on the terms and conditions set forth herein.  Seller reserves the right, in its sole discretion, to determine not to consummate, and to terminate, the sale of the Property by serving a notice of such termination

on Buyer.  No liability or obligations shall accrue to Seller's bankruptcy estate, Seller, or Seller's members and officers, as a result of any such termination.  Buyer's sole remedy, in the event that escrow fails to close as a result of Seller's inability to close escrow, shall be a refund of the Deposit in full.

13.    **Non-Refundability and Forfeiture of Deposit:  Except as set forth above in paragraph 12 to this Counteroffer, immediately upon expiration of the Due Diligence Deadline without Buyer's submission of a Notice to Cancel in accordance with paragraph 3 to this Counteroffer, the entirety of the Deposit shall be absolutely non-refundable and forfeited to the Seller.    Notwithstanding the immediately preceding sentence, in the event: (a) the Bankruptcy Court enters an order that does not authorize Seller to sell the Property to Buyer; or (b) the Bankruptcy Court enters an order that authorizes the sale to another bidder and Buyer is not a backup bidder, Seller shall refund the entire Deposit to Buyer within ten (10) calendar days following entry of such order of the Bankruptcy Court. In the event Buyer is overbid and is a backup bidder, Seller shall refund the entire Deposit to Buyer only if the Sale closes to the winning bidder and within ten (10) calendar days following such closing.**

[ _PJG_ ] **(Buyer's initials)**        [ _signature_ ] tials)

14.    Escrow Instructions:  Escrow instructions shall be signed by Buyer and Seller within fifteen (15) calendar days after execution of this Counteroffer. In the event that Buyer is unable to close escrow within fifteen (15) calendar days after entry of the Bankruptcy Court's order authorizing the Sale (the "Closing Date"), the Buyer shall compensate Seller two hundred fifty dollars ($250.00) per day for each day beyond the Closing Date that the Sale does not close for a limited extended period of no more than ten (10) calendar days. Thereafter, Seller shall have absolute discretion to either: (a) provide further extensions of the Closing Date at the same rate of compensation; or (b) terminate the Sale to Buyer and retain the entirety of the Deposit as liquidated damages.

15.    Bankruptcy Court Jurisdiction:  The Bankruptcy Court shall have jurisdiction to interpret and enforce the terms of this Counteroffer/agreement. This Counteroffer/agreement shall be construed pursuant to the laws of the State of California, except to the extent preempted by applicable Federal bankruptcy law.

4

16.    <u>Expiration of Offer</u>:  This Counteroffer shall expire, if not executed by Buyer and delivered to Seller's agent, W Darrow Fiedler, CalBRE #00676445, of Keller Williams Realty / KW Commercial, on or before 1:00 p.m. PDT, June 22, 2018.

17.    <u>Multiple Offers</u>:  Buyer recognizes that multiple offers and/or counteroffers (in addition to the instant Counteroffer) may be pending and Seller reserves the right, per Paragraph 12, to choose which contract to submit to the Bankruptcy Court for approval.

**Read, Understood, Agreed To and Accepted:**

**Seller**

_____    6-21-2018
Steve Rogers, Managing Member & Vice President    Date
for Grand View Financial, LLC - Seller

**Read, Understood, Agreed To and Accepted:**

**Buyer(s) and His/Her/Its/Their Agent**

DocuSigned by:
Parker James Geisinger
_____    _____
Parker James Geisinger - Buyer    Date
EB754D014CFE43F...

DocuSigned by:
Katelynn Joy Geisinger
_____    _____
Katelynn Joy Geisinger - Buyer    Date
EB754D014CFE43F...

DocuSigned by:
_____    _____
Coco Borges - Buyer's Agent    Date
CalBRE #01707939
E0CBA9819C374D3

5

# EXHIBIT "3"

RECORDING REQUESTED BY:

GRAND VIEW FINANCIAL LLC

MAIL TAX STATEMENTS AND

WHEN RECORDED MAIL TO:

GRAND VIEW FINANCIAL LLC
6601 Center Drive West, Suite 500-8354
Los Angeles, California 90045

**PLACER, County Recorder**
**RYAN RONCO**
**DOC- 2017-0013031-00**
4359
**THURSDAY, FEB 23, 2017 10:26:57**

| MIC | $3.00 | AUT | $3.00 | SBS | $2.00 |
| ERD | $1.00 | RED | $1.00 | REC | $11.00 |
| ADD | $0.00 | | | PCOR | $20.00 |

**Ttl Pd    $41.00    Rcpt # 02581726**
CLK98BT282/WG/1-3

Order No.:

Escrow No.:

APN 062-520-016-000

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

# GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S): DOCUMENTARY TRANSFER TAX IS $0 City Tax is $0 R&T Code 11930

This is a bona fide intervivos gift

_GIFT Computed on full value of property conveyed, or

_____ Computed on full value less liens and encumbrances remaining at time of sale.

___X__ Unincorporated area  _____ City of Alta

For valuable consideration, receipt of which is hereby acknowledged **DARREN L. LADD and DANNA LADD,
Husband and Wife as Joint Tenants,** Grantor(s) hereby grant(s) to:

**GRAND VIEW FINANCIAL LLC,**

All that certain real property situated in the City of **Alta,** County of **Placer,** State of **California,** more particularly
described as follows:

**SEE LEGAL DESCRIPTION ATTACHED HERETO MADE A PART HEREOF "EXHIBIT A"**

APN NO. 062-520-016-000
Also known as: 38303 Kearsarge Mill Road, Alta, California  95701

Dated: _2/22/_____ 2017

_____
**DARREN L. LADD**

Dated: _2/22/_____ 2017

_____
**DANNA LADD**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

> A notary public or other officer completing this certificate
> verifies only the identity of the individual who signed the
> document to which this certificate is attached, and not the
> truthfulness, accuracy, or validity of that document.

State of _California_

County of _Placer_

On _2.22.17_ before me, _Barbara A Kelly, Notary Public_
_____
(Name & Capacity of officer)

personally appeared _Darren L. Ladd_
_Danna Ladd_
_____.

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Barbara A Kelly_ (Seal)

> BARBARA A. KELLY
> Commission # 2118706
> Notary Public - California
> Placer County
> My Comm. Expires Aug 4, 2019

My Commission Expires: _8.4.19_

Notary Name: _Barbara A Kelly_   Notary Phone: _530.346.2455_

Notary Registration Number: _2118706_   County of Principal Place of Business: _Placer_

(Civil Code 1189(a)(1))
(Gov. Code 27201.5)

"EXHIBIT A"

## PARCEL ONE:

That portion of the southwest 1/4 of Section 15, Township 16 North, Range 11 East, MDB&M, included within the land shown and designated as Parcel D on Parcel Map No. 72979, filed for record in the Office of the Recorder of Placer County, California on April 20, 1979, in Book 14 of Parcel Maps at page 78, Placer County Records.

## PARCEL TWO:

A non-exclusive easement for road, drainage and public utility purposes over, under and across a portion of the Southwest quarter of Section 15, Township 16 North, Range 11 East, MDB&M, included within the land shown and designated as Area K of Parcel Map No. 72979, filed in the Office of the Placer County Recorder on April 20, 1979 in Book 14 of Parcel Maps, at page 78.

TOGETHER WITH an easement for road and utilities purposes over a strip of land 50 feet in width, the center line being more particularly described as follows:

Beginning at the Northeast corner of said Southwest quarter of the Southwest quarter of Section 15, thence from said point of beginning in an Easterly direction along the South line of the Northeast one quarter (1/4) of said Southwest one quarter (1/4) 700 feet more or less to an existing road traversing the East half of said Southwest quarter of Section 15 in a Northeasterly Southwesterly direction.

ALSO TOGETHER WITH a non-exclusive easement for road and utility purposes as described in Volume 1939, page 170, Volume 1944, page 672, and Volume 1916, page 154, Official Records, Placer County.

APN: 062-520-016

When embossed and signed, this is certified to be a true copy
of the records of the Placer County Clerk-Recorder's Office.

Ryan Ronco, Clerk-Recorder.

By _____ Deputy

08 / 23 / 20

# EXHIBIT "4"

P.O. Box 23159
San Diego, CA 92193-3159

IMPORTANT INFORMATION
ENCLOSED

71  96900  2484  0522  1166  3

**RECEIVED**

JUL   9 2018

LEVENE NEALE BENDER
YOO & BRILL L.L.P.

Mailed On:          7/6/2018
Mailing Number:     0004170-01
Reference Number:   17-0832          ClientID: Prestige000402  CE

Lindsey  L Smith
Levene, Neale, Bender, Rankin
& Bri
10250 Constellation Blvd Ste
1700
Los Angeles, CA 90067

GenericAddressInsert.doc                                                    Rev. 07/21/2010

PLACER, County Recorder
RYAN RONCO
**DOC- 2018-0047508-00**
Servicelink Title Agency Inc.
TUESDAY, JUL 3, 2018  11:06:20

| | | | |
|---|---|---|---|
| MIC | $3.00 | AUT | $5.00 | SBS | $4.00 |
| ERD | $1.00 | SB2 | $75.00 | REC | $13.00 |
| ADD | $0.00 | | |

Ttl Pd    $101.00    Rcpt # 02701571
CLK98CV282/GV/1-5

RECORDING REQUESTED BY:

ServiceLink

AND WHEN RECORDED MAIL TO:

**Prestige Default Services**
**1920 Old Tustin Ave.**
**Santa Ana, California 92705**
**Phone: 949-427-2010**

---

TS No.: **17-0832**          Loan No.: **\*\*\*215**

SPACE ABOVE THIS LINE FOR RECORDER'S USE
APN: **062-520-016-000**

## IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐẤY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY

**[PURSUANT TO CIVIL CODE § 2923.3(a), THE SUMMARY OF INFORMATION REFERRED TO BELOW IS NOT ATTACHED TO THE RECORDED COPY OF THIS DOCUMENT BUT ONLY TO THE COPIES PROVIDED TO THE TRUSTOR]**

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property.  No sale date may be set until approximately 90 days from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$170,294.76 as of 7/2/2018**, and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage.  If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing.  In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay.  You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made.  However, you and your beneficiary or mortgagee may mutually agree in

TS No.: **17-0832**        Loan No.: ***215**

### NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

writing prior to the time the notice of sale is posted (which may not be earlier than three months after this notice of default is recorded) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:
**US BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE PRP II PALS INVESTMENTS TRUST**
**c/o SN Servicing Corporation**
**323 5th Street**
**Eureka, CA 95501**


**If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan.  Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.**

**Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.** NOTICE IS HEREBY GIVEN: That **PRESTIGE DEFAULT SERVICES** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **12/7/2006**, executed by **DARREN L. LADD AND DANNA LADD, HUSBAND AND WIFE AS JOINT TENANTS**, as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR SUNTRUST MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS**, as beneficiary, recorded **12/14/2006**, as Instrument No. **2006-0133761-00**, of Official Records in the Office of the Recorder of **Placer** County, California describing land therein as:

AS MORE FULLY DESCRIBED ON SAID DEED OF TRUST.

Said obligations include **1 NOTE(S) FOR THE ORIGINAL** sum of **$356,200.00**, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by **US BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE PRP II PALS INVESTMENTS TRUST**, the Beneficiary; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:
**The installment of principal and interest and escrow amounts, if applicable, which became due on 11/1/2011, and all subsequent installments of principal and interest and escrow amounts through the date of this Notice, plus amounts that are due for late charges, delinquent property taxes, insurance premium, advances made on senior liens, taxes and/or insurance, trustee's fees, and any attorney fees and court costs arising from or associated with the beneficiaries efforts to protect the preserve its security, all of which must be paid as a condition of reinstatement including all sums that shall accrue through reinstatement or payoff.**

TS No.: **17-0832**       Loan No.: ***215**

### NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

Nothing in this Notice of Default should be construed as a waiver of any fees or other amounts owing to the Beneficiary pursuant to the terms of the loan documents.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for Sale, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Pursuant to the attached Declaration, the mortgage servicer declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil Code §2923.5, or is otherwise exempt from the requirements of §2923.5

**Dated: 7/2/2018**

**PRESTIGE DEFAULT SERVICES**

BY: _____
    **Briana Young, Trustee/Sale Officer**

PRESTIGE DEFAULT SERVICES MAY BE CONSIDERED A DEBT COLLECTOR AND ANY INFORMATION WILL BE USED FOR THAT PURPOSE.

**BENEFICIARY DECLARATION OF COMPLIANCE WITH (OR EXCEPTION FROM) CIVIL CODE**

**SECTION 2923.5 AND AUTHORIZATION OF AGENT (FOR NOTICE OF DEFAULT)**

**Prestige Default Services**
**1920 Old Tustin Ave.,**
**Santa Ana, CA 92705**

- **Borrower:**       **DARREN L. LADD and DANNA LADD**
- **Beneficiary:**    **US BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE PRP**
                      **II PALS INVESTMENTS TRUST**
- **Property:**       **38303 KEARSARGE MILL ROAD**
                      **ALTA, CA 95701**
- **Loan No:**        **\*\*\*215**
- **TS No:**          **17-0832**

**The undersigned beneficiary, or authorized agent for the beneficiary, hereby represents and declares:**

**[X] The beneficiary or beneficiary's authorized agent has contacted the borrower pursuant to, and has complied with, Civil Code Section 2923.5(a) (contact provision to "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure"). State the date "contact" with the borrower(s) was accomplished pursuant to Civil Code Section 2923.5(a)(2): _ 9 | 14 _____, 20 17 .**

**[X] The beneficiary or beneficiary's authorized agent has exercised due diligence to contact the borrower as required by California Civil Code Section 2923.5(e) and, after waiting two (2) weeks after the telephone call requirements of Civil Code Section 2923.5(e)(2)(A) were satisfied, the beneficiary or the beneficiary's authorized agent sent to the borrower(s), by certified mail, return receipt requested, the letter required by Civil Code Section 2923.5(e)(3), which was mailed on _ 10 | 6 _____, 20 17 . (Date of mailing)**

**[ ] Pursuant to Civil Code Section 2920.5(c)(2)(A), the borrower has surrendered the secured property as evidenced by either a letter confirming the surrender or by delivery of the keys to the secured property to the beneficiary, the beneficiary's authorized agent or to the trustee. The surrender letter was received on _____(date); the keys were received on _____. (date).**

**[ ] Pursuant to Civil Code Section 2920.5(c)(2)(B), the beneficiary or beneficiary's authorized agent has evidence in its file, and reasonably believes, that the borrower has contracted with an organization, person, or entity whose primary business is advising people who have decided**

to leave their homes on how to extend the foreclosure process and to avoid their contractual obligations to beneficiaries.

[ ] Pursuant to Civil Code Section 2920.5(c)(2)(C), the beneficiary or beneficiary's authorized agent has verified information that on or before the date of this declaration, the borrower(s) has filed for bankruptcy and the proceedings have not been finalized. "Finalized" is not defined by 2920.5(c)(2)(C). For purposes of this Code section, trustee, foreclosure agent and/or their authorized agent define the term as either (1) an order entered on the court's docket closing the file by the court; or (2) an order entered on the court's docket dismissing the bankruptcy case. If the beneficiary or the beneficiary's agent interprets "finalized" in another manner, please state the basis upon which the beneficiary believes that the bankruptcy has not been "finalized":_____.

[ ] The provisions of Civil Code 2923.5 do not apply, because [ ] the property is NOT THE BORROWER'S PRINCIPAL RESIDENCE; or [ ] the property is COMMERCIAL PROPERTY.

[ ] the loan is not secured by a first mortgage or first deed of trust that encumbers real property described in Civil Code Section 2924.15(a)

The undersigned authorized the trustee, foreclosure agent and/or their authorized agent to sign, on behalf of the beneficiary/authorized agent, the notice of default containing the declaration required pursuant to Civil Code Section 2923.5(b).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: _6/22/15_

US BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE PRP II PALS INVESTMENTS TRUST

By: SN Servicing Corporation, as servicer

By: Rachelle Koher

Its: Asset Manager

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **DEBTOR'S MOTION FOR THE ENTRY OF AN ORDER: (1) APPROVING THE SALE OF REAL PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, WITH THE EXCEPTION OF ENUMERATED EXCLUSIONS, SUBJECT TO OVERBID, (2) FINDING THAT THE BUYER IS GOOD FAITH PURCHASER, (3) APPROVING BIDDING PROCEDURES AND BREAK-UP FEE, (4) AUTHORIZING AND APPROVING THE PAYMENT OF CERTAIN CLAIMS FROM SALE PROCEEDS, AND (5) WAIVING THE FOURTEEN-DAY STAY PERIOD SET FORTH IN BANKRUPTCY RULE 6004(h); MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 12, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd M Arnold     tma@lnbyb.com
- Michael Jay Berger     michael.berger@bankruptcypower.com, yathida.nipha@bankruptcypower.com;michael.berger@ecf.inforuptcy.com
- Matthew R. Clark     bankruptcyecfs@gmail.com, mclark@ecf.courtdrive.com
- Theron S Covey     tcovey@rasflaw.com, CAECF@tblaw.com
- Jered T Ede     jede@hallgriffin.com, cgallardo@hallgriffin.com
- Sean C Ferry     sferry@ecf.courtdrive.com, bkyecf@rasflaw.com
- Todd S Garan     ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
- Can Guner     cguner@rasflaw.com
- Jamie D Hanawalt     ecfcacb@aldridgepite.com, jhanawalt@ecf.inforuptcy.com
- Matthew S Henderson     matthew.henderson@piblaw.com, marian.flores@piblaw.com
- Laurie Howell     laurie.howell@tflglaw.com
- Chi L Ip     filing@lawyer4property.com, jenny@lawyer4property.com
- Merdaud Jafarnia     bknotice@mccarthyholthus.com, mjafarnia@ecf.inforuptcy.com
- Ian Landsberg     ian@landsberg-law.com, casey@landsberg-law.com;lisa@landsberg-law.com;diana@landsberg-law.com;yesi@landsberg-law.com;ilandsberg@ecf.inforuptcy.com
- Megan E Lees     caecf@tblaw.com, MEL@ecf.inforuptcy.com
- Richard D Marks     RDMarks@rdmpc.com
- Angie M Marth     amarth@logs.com, ssali@logs.com
- Erin M McCartney     bankruptcy@zbslaw.com, emccartney@ecf.courtdrive.com
- Vinod Nichani     vinod@nichanilawfirm.com, vnichani1978@gmail.com
- Michael G Olinik     michael@oliniklaw.com, rachael@callahanfirm.com
- David M Poitras     dpoitras@wedgewood-inc.com, dpoitras@jmbm.com
- Kelly M Raftery     bknotice@mccarthyholthus.com, kraftery@ecf.courtdrive.com
- Cassandra J Richey     cdcaecf@bdfgroup.com
- Christopher O Rivas     crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com
- Edward G Schloss     egs2@ix.netcom.com
- Lindsey L Smith     lls@lnbyb.com, lls@ecf.inforuptcy.com
- Edward A Treder     cdcaecf@bdfgroup.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Larry D Webb     Webblaw@gmail.com, larry@webblaw.onmicrosoft.com;r51666@notify.bestcase.com
- Sharon Z. Weiss     sharon.weiss@bclplaw.com, raul.morales@bclplaw.com
- Bethany Wojtanowicz     bethanyw@w-legal.com, BNC@w-legal.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

- Hatty K Yip    hatty.yip@usdoj.gov
- Kristin A Zilberstein    ecfnotifications@ghidottilaw.com

**2.  SERVED BY UNITED STATES MAIL**: On **July 12, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **July 12, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**SERVED BY PERSONAL DELIVERY**
Honorable Robert N. Kwan
United States Bankruptcy Court
255 E. Temple Street, Suite 1682 / Courtroom 1675
Los Angeles, CA 90012

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| July 12, 2018 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

Grand View Financial LLC
RSN
File No. 8277

**RSN** U.S. BANK NATIONAL ASSOCIATION.
AS TRUSTEE, SUCCESSOR IN INTEREST
TO WACHOVIA BANK, NATIONAL
ASSOCIATION, AS TRUSTEE FOR J.P.
MORGAN MORTGAGE TRUST 2005-A3,
MORTAGE PASS-THROUGH
CERTIFICATES
c/o RAS CRANE. LLC
BANKRUPTCY DEPARTMENT
10700 ABBOTT'S BRIDGE ROAD
SUITE 170
DULUTH, GA 30097

Amador County Tax Collector **RSN**
Attn: Michael E. Ryan
810 Court Street
Jackson, CA 95642

Grand View Financial LLC
8939 S Sepulveda Blvd.,Suite 103
Los Angeles, CA 90045

Grand View Financial
File No. 8277
38303 Kearsage Service List

**Former Owners**
Darren L. Ladd
Danna N. Ladd
38303 Kearsarge Mill Road
Alta, CA 95701

**Placer County**
Placer County Treasurer-Tax Collector
Jenine Windeshausen
2976 Richardson Dr.
Auburn, CA 95603

**UMPQUA Bank**
Cort L. O'Haver, CEO
One SW Columbia St., Ste 1200
Portland, OR 97258

**PRP II Pals Investments Trust**
c/o Agent - U.S. BANK TRUST NATIONAL
ASSOCIATION
300 DELAWARE AVENUE 9TH FLOOR
WILMINGTON, New Castle, DE, 19801

**Alleged Secured Creditor US Bank Servicer**
Prestige Default Services
1920 Old Tustin Ave.
Santa Ana, California 92705

**Southern Pacific Pipelines Inc.**
Attn Officer or Director
1570 S RIVER RD
WEST SACRAMENTO, CA, 95691-2811

**Capitol Valley Bank**
STEVE KALMBACH,
Agent for Service
2998 DOUGLAS BLVD
ROSEVILLE CA 9566

**Beneficial California Inc.**
Kathryn Madison, CEO
26625 N. Riverwood Blvd.
Mettawa, IL 60045

**Alleged Secured Creditor US Bank's Counsel:**
Kristin A. Zilberstein, Esq.
Jennifer R. Bergh, Esq.
LAW OFFICES OF MICHELLE GHIDOTTI
1920 Old Tustin Ave.
Santa Ana, CA 92705

**Western Planning and Research**
JUSTIN F BARBER,
Agent for Service
3440 PINE RIDGE LN
AUBURN CA 95603

**Suntrust Mortgage, Inc.**
Dorinda Smith,CEO
901 Semmes Avenue
Richmond, VA 23224

**Beneficial California Inc.**
c/o Beneficial Financial I, Inc.
Kathryn Madison, CEO
1421 W. Shure Dr., Suite 100
Arlington Heights, IL 60004